[Civ. No. 11441.   Third Dist.   Sept. 19, 1967.]

EDWIN G. DUNBAR, Plaintiff and Appellant, v. HUMBOLDT BAY MUNICIPAL WATER DISTRICT, Defendant and Respondent.

Mathews & Traverse, Mathews, Traverse & McKittrick and Francis B. Mathews for Plaintiff and Appellant.

Mitchell & Henderson, Mitchell, Henderson & Dedekam, Clifford B. Mitchell and Michael Hill for Defendant and Respondent.

Thomas C. Lynch, Attorney General, Willard A. Shank, Assistant Attorney General, and N. Eugene Hill, Deputy Attorney General, as Amici Curiae on behalf of Defendant and Respondent.

VAN DYKE, J.*—This is an appeal from an action in inverse condemnation. Plaintiff, appellant here, owns 40 acres of land in Trinity County across which runs the Mad River, a

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

nonnavigable stream. The river approximately bisects the land of appellant from east to west. He has access to the north portion by a public road. His access to the south portion is by fording the river. The property in common with much of the property in the general area is suitable for summer residences for vacation purposes and has little value otherwise. On that portion of his land lying south of the river appellant has constructed a summer home. During the summer months appellant forded the river without difficulty to reach his home from the public road. He was able to do this with an ordinary passenger car because during the summer months the flow was so diminished that the depth where appellant customarily forded the river was reduced to depths varying from 4 inches to 9 inches and presented no impediment to easy crossing. This was the situation when respondent district built a dam, known as Ruth Dam, across the river about one-half mile upstream from appellant's property and thereby partially impounded the flow of the river for the purpose of using water far downstream below appellant's land for district purposes.

The result of impounding the water in the reservoir and its release during late spring, summer and early fall was to increase the natural flow and to make crossing practically impossible for passenger vehicles. During these months the augmented stream is from 13 to 20 inches deep at appellant's ford. In order to gain access to his residence on the south side of the river, appellant purchased a specially adapted four-wheel drive vehicle with which he was and is able to use the ford.

The trial court made findings which may be summarized as follows: Plaintiff is the owner of a parcel of real property, consisting of 40 acres more or less. The only access by motor vehicle which plaintiff has had to his property situated on the south side of the river was and now is to ford the river. Prior to the construction of the Ruth Dam, at the point of plaintiff's crossing, the natural flow of water between approximately the middle of May of each year until the middle of November reached the level of between 4 inches and 9 inches. As a consequence of the construction of the dam by defendant, the level of the river at plaintiff's crossing has been caused to rise during said months to a depth ranging from 13 to 20 inches. This raising of the level of flow has made it difficult and hazardous for plaintiff to drive a conventional

automobile across the stream. During the summer months from mid-May to mid-November, prior to the construction of the dam, plaintiff was able to cross the river to his property by passenger-type automobile. By reason of the construction, maintenance and operation of the dam by defendant, the access of the plaintiff has been and will hereafter be impaired. Plaintiff's property has thereby suffered a diminution in value. But plaintiff's property has derived special benefits from the construction of the dam in that since the dam was completed plaintiff's property has been given increased protection against floods, his right of access during the months from November 15 to May 15 of the year has improved, and the swimming and fishing on his property has improved because of the year-round presence of a flow of water in the river. The value of plaintiff's property has been increased by reason of said special benefits. The increment in value from said special benefits exceeds the diminution in value hereinabove found.

As a conclusion of law the court adjudged that plaintiff should take nothing from defendant.

Appellant contends that he received no special benefit by reason of the maintenance and operation of the dam; that in respect to special benefits the evidence does not support the findings; and that in view of the court's finding that the value of his property has been diminished, the judgment in turn is not supported. With this contention we agree.

We have taken judicial notice of the existence and general geographical features of the Mad River and in doing so may resort to appropriate books or documents of reference. (Code Civ. Proc., § 1875 (now Evid. Code, § 452); *Gray* v. *Reclamation Dist. No. 1500*, 174 Cal. 622, 626 [163 P. 1024].) We take the following from "A Preliminary Evaluation of the Effect of the Ruth Dam Project on Fisheries of the Mad River," dated June 1957, as revised February 1958, prepared by the California Fish and Game Commission. The Mad River drains a total of 496 square miles. It is estimated that the main annual runoff is 925,500 acre-feet. Instantaneous discharges as measured near Arcata at the lower end of the drainage have varied from a high of 52,200 second-feet to a low of 17 second-feet. Occasionally the entire flow in sections near the mouth is under the gravel, leaving dry stretches of channel. Precipitation and runoff are high during the winter and spring months but runoff is quite low in the late summer

and fall. The Ruth Dam site is situated 79 miles above the mouth of the river. The river has an approximate total length of 90 to 100 miles. Water developed at Ruth Dam is released downstream and diverted by a low dam at Essex, 7 miles above the mouth of the stream. The Ruth Dam will control the runoff from only 25 percent of the entire stream basin. The river is a major fish production stream and supports runs of anadromous salmon and steelhead. A sandbar closes the mouth of the river during periods of low flow in most years. Anadromous fish have access to only portions of the Mad River basin. Sweasy Dam, 17 miles above the stream mouth, is provided with a fish ladder, and steelhead and both species of salmon spawn in the stream above it. About 24 miles above Sweasy Dam is a 2-mile section of roughs, consisting of large boulders in the channel, with a 25-foot fall at its head. This fall marks the limit of anadromous fish migration.

■ The Mad River is nonnavigable and hence appellant owns the land under the flow of the stream. ■ The right to use a natural channel as a conduit for artificial flow, as respondent is doing, is well established so long as such use does not interfere with the rights of others. If such use does interfere, then the damage caused is compensable. (52 Cal. Jur.2d, Waters, § 614, p. 236 et seq.; *Stevens* v. *Oakdale Irr. Dist.*, 13 Cal.2d 343, 352 [90 P.2d 58]; *Podesta* v. *Linden Irr. Dist.*, 141 Cal.App.2d 38 [296 P.2d 401].)

Since, as the court found, the increased flow of the stream across plaintiff's property damaged his land and diminished its value, the loss thus suffered was compensable in this action. (51 Cal.Jur.2d, Waters, § 111, p. 577; *Podesta* v. *Linden Irr. Dist., supra.*) Therefore, according to the court's findings, appellant was entitled to compensation for the diminution in value of his property so caused. However, as noted, the court found that appellant's property derived special benefits from the construction, maintenance and operation of Ruth Dam and that these special benefits increased the value of his land more than the respondent's invasion had lowered that value.

■ Special benefits are only such as result from the mere construction of the improvement and are peculiar to the property which has been damaged. (*Beveridge* v. *Lewis,* 137 Cal. 619 [67 P. 1040, 70 P. 1083, 92 Am.St.Rep. 188, 58 L.R.A. 581]; *County of Los Angeles* v. *Marblehead Land Co.,* 95 Cal.App. 602 [273 P. 131]; *Podesta* v. *Linden Irr. Dist.,*

*supra.*) The burden of proof as to the existence and effect of such benefits was on respondent. The distinction between general and special benefits, which latter species of damage alone can be set off against damage incident to a taking or damaging of property through the exercise of the power of eminent domain, is a matter that is unclear and as to which both state and federal jurisdictions present many conflicts. A comprehensive commentary upon the subject appears in 145 American Law Reports, at pages 7 to 299. After much discussion and numerous citations, the author of the commentary summarizes as follows (p. 78) : ". . . If an attempt should be made to define affirmatively what constitutes the deductible special benefit, the only general observation that can be safely made is that a benefit is the more likely to be classified as a special or peculiar benefit the smaller the number of other estates upon which a like or similar benefit is conferred. . . ."

The only testimony offered by respondent as supportive of its contention that appellant's land derived the special benefits referred to in the court's findings emanated from a single value witness, who, though qualifying as possessing special knowledge in matters of real estate values, made no attempt to qualify as an expert witness on the subject of the special benefits here claimed.

On the subject of benefits to recreational swimming, the only factual evidence appearing in the record, and it is undisputed, was given by appellant who testified that whereas before the operation of the dam there had been recreational swimming available to him and to his guests, the added discharge of water from the dam compelled the discontinuance of swimming. This, he said, was so because before the flow was augmented the water crossed his land at a temperature of about 75 degrees, but after the augmentation the temperature of the water was lowered to approximately 54 degrees which was too cold for swimming. The finding that appellant's land benefited from improvement in swimming is against the evidence. But equally important is the failure of proof that, even assuming benefits from increased flow, this was a special benefit rather than a general one enjoyed by all landowners downstream from the dam. This increased flow arising at the dam would be felt all the way down the river until at a point some 7 miles above its mouth, the increased flow would be diverted for district uses. Any recreational swimming benefits which

may be assumed to arise from augmenting the summer flow of the river could not be classified as special and peculiar to the property of appellant.

■ On the subject of special benefits from the improvement of fishing, we have nothing in the record save conclusionary *ipse dixit* of the unqualified "expert" that improvement in fishing would be so derived by appellant's land as contrasted with the land of downstream owners. Augmented summer flow might improve fishing down the course of the river from the dam to the mouth of the stream, but there is nothing in the record to support the court's finding that such benefits were peculiar to the land of appellant. The only conclusion that can be drawn is that any improvement in recreational fishing that may be derived by appellant's land is general, not special.[1]

---

[1]By way of illustration only we refer again to the foregoing evaluation of the effect of the Ruth Dam on fisheries of the Mad River. Therein we find the following: Fishery values along the Mad River lie not only in recreational fishing within the basin, but in contributions to commercial and sport fisheries in the ocean. King salmon, silver salmon and steelhead and rainbow trout are the main species of anadromous fish entering the Mad River to spawn. They constitute the major fisheries of the river. Resident forms of rainbow trout are found in the stream above Sweasy Dam and in the upper reaches of most tributaries. Most tributary streams are below the Ruth Dam. Resident trout likewise support important fisheries. King salmon enter the stream with the first substantial rains in the fall. A sandbar closes the mouth of the Mad River during periods of low flow in most years and it is the breaking of the bar by increased flows that enables the fish to enter the stream. King salmon are subject to sport fishing from the time they enter the stream through their spawning period—October to December. Generally mild weather and moderate stream flows during the time king salmon are available to anglers results in fairly large numbers of them being taken. Silver salmon and steelhead do not enter the river in large numbers until stream flows have risen to substantial levels. Silver salmon migration and spawning activities usually peak about a month after those of king salmon. Steelhead migration continues well into the spring months, with most of the spawning taking place in late winter or early spring months. Since silver salmon and steelhead are in the stream during the months of greater rainfall, weather and stream-flow conditions result in fewer fishing days for these fish than for king salmon. Most king and silver salmon spawning in the Mad River use areas downstream from Sweasy Dam. The bulk of the steelhead run, however, probably spawn upstream from the dam. It is estimated that the Mad River annually contributes 212,156 pounds of salmon to the commercial catch. In addition, an estimated 17,457 man-days are expended on Mad River fish, both in the ocean and in the stream. This includes salmon, steelhead and trout. The construction, maintenance and operation of the Ruth Dam, storing water for release downstream during low-flow months, would have a beneficial effect on the fisheries on the river. The proposed minimum flow to reach the diversion at Essex would be 212 second feet during dry seasons but most of the flows would be greater. This is in contrast to the low of 17

■ The court found that among the benefits special as to appellant's land was that of flood protection from regulation of river flow. We fail to find any factual support for this finding. There is no testimony that the operation of the dam increased flood protection to the benefit of appellant's land, and there is testimony contradictory to that assumption. Plaintiff testified that the dam did not intercept the flood flow of the river since the reservoir capacity was far below the winter flow. As he put it, it was like filling a cup, and when the cup was full, the full flow of the river came down across his land as it always had. There was no denial of this testimony. That there were benefits through flood protection is a matter of speculation upon this record. But, assuming some such benefit, yet there is nothing to show that benefit was special as to appellant's land.

■ Another special benefit found by the court was that appellant's right of access during the winter months had been improved. The so-called expert testified that because to some extent the dam leveled out the floods the river was fordable through appellant's land on more occasions that it had been theretofore. Here again, if such effect there was in the matter of fordability, it was a benefit common to all those below plaintiff on the stream and cannot be classified as a benefit special to appellant's land.

Since the record does not support the findings of special benefits. the judgment must be reversed.

■ In view of a retrial, we think it well to discuss an assignment of error not hereinbefore mentioned. Appellant testified that he was compelled to expend several thousand dollars to buy and to adapt and equip a four-wheel-drive automobile in order to ford the river. He also gave estimates

---

second feet near Arcata during the period of records available. A minimum flow of 37 second feet is to be provided from the dam in the river below the diversion of Essex. This would also prevail during the dry season. With respect to steelhead, these fish, prior to the dam (Sweasy Dam) had little difficulty ascending the river system to spawn, but the increased flow would be of benefit to young fish, since young steelhead spend one or two or more years in fresh water before entering the sea. Low flows in the summer tend to strand many fish in the tributaries of the river and some in pool areas of the main stream. A substantially increased flow would reduce this loss and should provide for an increase of the organisms needed for fish production in the stream. This would also be beneficial to adult summer-run steelhead which spend the summer and fall months in the river. It is possible that a 50 percent increase could be realized by this species. And since present fisheries support an estimated 6,000 man-days of recreation, another 3,000 man-days could be provided by the project.

of the cost of adopting an alternative route which would cross the dam and go thence over land owned by others until his land was reached. On motion of respondent this evidence was stricken and appellant assigns error. The damages recoverable here must be a measure in money of the diminution in value of appellant's property caused by respondent's invasion of his rights. But the evidence stricken was relevant and material as aiding the court in evaluating appellant's loss and should have remained in the case.

We cannot find error here, however, because in the order striking the evidence there is a recital that the order was based on a concession by appellant. The record imports verity and we cannot ignore it though the issue is argued in the briefs as if there had been no concession.

The judgment is reversed.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied October 19, 1967, and respondent's petition for a hearing by the Supreme Court was denied November 15, 1967. Traynor, C. J., was of the opinion that the petition should be granted.