[Civ. No. 893.   Fifth Dist.   Dec. 13, 1968.]

SACRAMENTO AND SAN JOAQUIN DRAINAGE DISTRICT, Plaintiff and Appellant, v. W. P. RODUNER CATTLE & FARMING CO., Defendant and Respondent.

200

Thomas C. Lynch, Attorney General, and N. Eugene Hill, Deputy Attorney General, for Plaintiff and Appellant.

Griswold & Barrett and Stephen P. Galvin for Defendant and Respondent.

GARGANO, J.—This action was brought by the Sacramento and San Joaquin Drainage District to condemn approximately 400 acres of land belonging to respondent, W. P. Roduner Cattle & Farming Co., for use in the construction of a channel known as the Eastside By-Pass. After jury trial on the issue of damages the jury awarded respondent the sum of $136,337 for the acreage taken and $79,030.50 for the severance damage to respondent's remaining land. The jury also found that respondent's remaining land was benefited by the construction of the public improvement and fixed the value of the benefit at $2,000. Judgment was entered on the jury's verdict, and the district has appealed.

The remaining undisputed facts are substantially as follows: Prior to the construction of the Eastside By-Pass a substantial part of the overflows of the San Joaquin River and its tributaries flowed into Ash Slough, which crossed over respondent's land. The slough did not have sufficient capacity to hold the water at its heaviest, and extensive flooding resulted. Thus, respondent's land, consisting of approximately 3,400 acres of agricultural and pasturage land, was subject to periodic inundation in varying degrees.

The Eastside By-Pass was constructed to contain the overflows of the San Joaquin River and its tributaries. It was paid for by the State of California from the state general fund. It also crosses over respondent's land, absorbing approximately 400 acres. It is this acreage that the district condemned in this proceeding.

Appellant does not challenge the amount fixed by the jury for the acreage taken or for the severance damages awarded. Appellant appeals only from that part of the judgment relating to the special benefit. Its main contention is that the jury correctly found that respondent's remaining land was benefited by the Eastside By-Pass but that the amount which the jury fixed as the value of this benefit is not supported by the

only evidence offered on the issue. On the other hand, respondent stoutly maintains that there is sufficient evidence to support the judgment. It also vigorously asserts that any benefit its land received from the construction of the public improvement is a general benefit as a matter of law, and the court erred when it submitted the benefit issue to the jury.

█ The statutory authority for offsetting benefits against severance damages is contained in section 1248 of the Code of Civil Procedure. Under the plain language of this section, when property taken by the condemnor is part of a larger parcel of property owned by the condemnee, the court or jury must offset against the severance damages to the remaining parcel, any value it may have received from the construction of the public improvement.[1] However, a logical, albeit somewhat clouded, distinction has been drawn between special and general benefits, and by judicial fiat only special benefits may be offset (*Beveridge* v. *Lewis*, 137 Cal. 619 [67 P 1040, 70 P. 1083, 92 Am.St.Rep. 188, 59 L.R.A. 581]; *County of Los Angeles* v. *Marblehead Land Co.*, 95 Cal.App. 602 [273 P. 131]). █ As the California Supreme Court stated in the early *Beveridge* decision:

"Benefits are said to be of two kinds, general and special. General benefits consist in an increase in the value of land common to the community generally, from advantages which will accrue to the community from the improvement. (Lewis on Eminent Domain, sec. 471.) They are conjectural and incapable of estimation. They may never be realized, and in such case the property-owner has not been compensated save by the sanguine promise of the promoter.

"Special benefits are such as result from the mere construction of the improvement, and are peculiar to the land in question. The trend of decision is very decidedly to the conclusion

---

[1]Section 1248 provides in pertinent part as follows:

"The court, jury, or referee must hear such legal testimony as may be offered by any of the parties to the proceeding, and thereupon must ascertain and assess: 3. Separately, how much the portion not sought to be condemned, and each estate or interest therein, will be benefited, if at all, by the *construction of the improvement* proposed by the plaintiffs. . . . If the benefit shall be equal to the damages assessed under subdivision 2, the owner of the parcel shall be allowed no compensation except the value of the portion taken. . . . If the benefit shall be less than the damages so assessed, the former shall be deducted from the latter, and the remainder shall be the only damages allowed in addition to the value. If the benefit shall be greater than the damages so assessed, the owner of the parcel shall be allowed no compensation except the value of the portion taken, but the benefit shall in no event be deducted from the value of the portion taken; . . ."

that general benefits shall not be allowed as a set-off to damages, even when no statute prescribes a contrary rule.

"     .     .     .     .     .     .     .     .     .     .     .     .     .     .

"Special benefits, as I have said, are such as are peculiar to the property which it is alleged has been damaged, such as are reasonably certain to result from the construction of the work. Illustrations are afforded where a marsh will be drained or levee built which will protect the land from floods." (*Beveridge* v. *Lewis,* 137 Cal. 619, 623-624, 626 [67 P. 1040, 70 P. 1083, 92 Am.St.Rep. 188, 59 L.R.A. 581].)[2]

Manifestly, it would appear that if respondent's land (the portion not taken by appellant) was benefited at all by the Eastside By-Pass, the benefit was a special benefit, not a general benefit as a matter of law. The benefit was incidental to the main purpose of the project and arose because of the land's peculiar relation to the public improvement. In short, if the fair market value of respondent's remaining 3,000 acres was increased at all by the construction of the Eastside By-Pass, the increase arose from a discernible change in the potential land use since it was no longer subject to periodic inundation, and this is one of the main characteristics of a special benefit.

Respondent alleges, however, that its land is located within the boundaries of the Sacramento and San Joaquin Drainage District and that the district was formed to protect its landowners (Stats. 1955, ch. 1075, p. 2047; Stats. 1961, ch. 11, p. 539). Respondent therefore argues that its land is only one of many parcels of land the Eastside By-Pass was con-

[2]See also 3 Nichols on Eminent Domain (3d ed.), Compensation, section 8.6203, pages 66-68, wherein it is stated: "The most satisfactory distinction between general and special benefits is that general benefits are those which arise from the fulfillment of the public object which justified the taking, and special benefits are those which arise from the peculiar relation of the land in question to the public improvement. The distinction was expressed in one case as follows: 'There is a well-recognized distinction between general and special benefits. The former is what is enjoyed by the general public of the community, through which the highway passes, whether it touches their property or not. An improved system of highways generally enhances all property which is fairly accessible to it. But that which borders it, or through which it extends, has benefits by reason of that circumstance which are not shared by those which are not so situated.'

"Ordinarily, the foregoing test is a satisfactory one, though sometimes difficult to apply. In other words, the general benefits are those which result from the enjoyment of the facilities provided by the new public work and from the increased general prosperity resulting from such enjoyment. The special benefits are ordinarily merely incidental and may result from physical changes in the land, from proximity to a desirable object, or in various other ways."

structed to protect and that any benefit it may have received was in common to the ''community'' under the rule articulated in *Beveridge* v. *Lewis, supra,* 137 Cal. 619.

Respondent's argument is not persuasive. The Eastside By-Pass was not constructed with money raised by the Sacramento and San Joaquin Drainage District nor was repondent's land assessed for the cost of this improvement. On the contrary, the project was paid for by the State of California with money taken from the state general fund. We must therefore assume that when the Legislature appropriated state money for a local public project, it believed the overall benefit to be derived by the people of the State of California from the reclamation of flood lands, the protection of state and public highways against flooding, and the elimination of health hazards justified the statewide expenditure; otherwise, the state donated its public funds to a small segment of private landowners contrary to the prohibition of article IV, section 31 of the California Constitution. Thus, we must also assume that if any increase in the market value of respondent's land resulted from the construction of the public project, it was not in common with the people of the State of California and was incidental to its main purpose.

The cases cited by respondent are distinguishable. In *Dunbar* v. *Humboldt Bay Municipal Water Dist.,* 254 Cal.App.2d 480 [62 Cal.Rptr. 358], the alleged special benefit, if any, was essentially speculative, and the court merely held that the condemnor failed to sustain its burden of proof. Moreover, the court did not hold that a benefit is general as a matter of law merely because it is in common with other lands. The court simply suggested that this was one of the most common characteristics of a general benefit. Significantly, the court at page 486 stated: '' '. . . If an attempt should be made to define affirmatively what constitutes the deductible special benefit, the only general observation that can be safely made is that a benefit is more likely to be classified as a special or peculiar benefit the smaller the number of other estates upon which a like or similar benefit is conferred. . . .' ''

In *Podesta* v. *Linden Irr. Dist.,* 141 Cal.App.2d 38 [296 P.2d 401], the court held that if the condemnor was permitted to offset the alleged special benefit, the offset would have resulted in a double charge. The court at page 54 said: ''Also, for the service of water through that channel, a charge could be made upon all lands receiving water. If that were done, and if plaintiffs were presently charged with the full value of

the benefit, the result would be a double charge. This cannot be done.''

We shall now direct our attention to appellant's contention that there is no substantial evidence to support the jury's verdict fixing the value of the special benefit, since this verdict is not within the range of the opinions expressed by appellant's two expert witnesses, both real estate appraisers. The first witness, Walter F. Willmette, testified that respondent's remaining land was benefited by the construction of the Eastside By-Pass because respondent could not use the land for agricultural purposes without danger of periodic inundation and boldly opined that the amount of this benefit was $90,000. However, the witness did not describe, with particularity, what parts or to what extent respondent's remaining land was subject to inundation prior to the construction of the public improvement nor did he testify as to what extent the potential agricultural use had increased. Moreover, the witness did not relate his opinion on the value of the special benefit to the difference between the market value of the land in its ''before'' and ''after'' condition. On the contrary, Mr. Willmette stated that the value of the benefit was $90,000 because two engineers told him that this is what it would have cost respondent (including land and improvements) to construct its own private channel.

Appellant's second witness, Mr. William A. Murray, testified that respondent's remaining land was benefited to the extent of $57,800. He attributed $10,000 to the eight miles of all-weather graveled levee road and the remaining $47,800 to the restoration of lands located in the old channel and the increased potential use of lands no longer subject to inundation. However, this witness spoke mainly in generalities; he did not precisely identify, either in quantity or location, the old channel acreage that was restored. Moreover, he did not precisely base his opinion on the value of the special benefit to the difference between the market value of the land in its ''before'' and its ''after'' condition.

There is of course a clear distinction between the essential characteristics of a special benefit and the measure of its value once the benefit has been found to exist. As we have tried to demonstrate, a special benefit arises from the mere construction of the project, is peculiar to the land in question and is characterized by physical changes in the land and various other factors. Moreover, whether land has been benefited by a public improvement, and if so to what

extent, are questions of fact to be determined by the trier of fact.[3] ■ On the other hand, once a special benefit has been shown to exist the only relevant evidence of its value is the resulting increase, if any, in the fair market value of the property affected (*Sacramento etc. R.R. Co.* v. *Heilbron*, 156 Cal. 408 [104 P. 979]). And, it is this value which may be established only through the opinions of witnesses qualified to express such opinions (Evid. Code, § 813, subd. (a)). In other words, it is on the issue of value that the criteria used (highest and best land use, comparable sales, market data and similar factors) by the expert witness to support his opinion have no independent probative value (*People* ex rel. *Dept. of Public Works* v. *McCullough*, 100 Cal.App.2d 101 [223 P.2d 37]; *Redevelopment Agency* v. *Modell*, 177 Cal.App.2d 321 [2 Cal. Rptr. 245]).[4]

■ With this distinction in mind, it is manifest that the testimony of appellant's witnesses does not have the convincing force required to induce a jury finding in appellant's favor on the issue of special benefits. The reasons given by one witness to support his opinion of the value of the special benefit were incompetent to establish its value. The other witness spoke mainly in generalities and did not precisely relate his opinion of value to market value. Thus, (as appellant's counsel conceded at oral argument) the jury was entitled to reject both opinions, and had it done so, with nothing more, appellant probably would not have appealed from the verdict.

■ The thrust of appellant's argument, therefore, is that the amount fixed by the jury as the value of the benefit is not supported by any other competent evidence.

We do not agree with appellant's contention. Respondent called its vice president, Lloyd Roduner, to rebut Mr. Willmette's opinion that it would have cost $90,000 (including land and improvements) to build its own channel to protect its land against periodic flooding; Mr. Roduner testified that respondent could have built a suitable levee to protect its land against inundation at a cost of approximately $1,680. The jury apparently believed this testimony and fixed the value of

---

[3] In the instant case the court, after defining a special benefit, instructed the jury that it was up to the jury to determine whether defendant's land was specially benefited by the public improvement and if so the extent of the benefit. The court gave BAJI Jury Instructions 508, 508-A and 509.

[4] See *Los Angeles County Flood etc. Dist.* v. *McNulty*, 59 Cal.2d 333 [29 Cal.Rptr. 13, 379 P.2d 493], for the contrary view. However, Evidence Code section 813(a) arguably adopts the view expressed in *People* ex rel. *Dept. of Public Works* v. *McCullough, supra*, 100 Cal.App.2d 101.

the special benefit accordingly.[5] Thus, if respondent's evidence is incompetent to establish the value of the special benefit, it was invited by appellant who cannot now complain on appeal. In other words, Mr. Willmette not only told the jury that respondent's remaining land was benefited by the Eastside By-Pass because it was no longer subject to periodic inundation, but he also said that the value of the benefit amounted to what it would have cost respondent to build a hypothetical private channel. Respondent rebutted this testimony with evidence that it would have cost only about $2,000 to build a suitable levee to protect its land against extensive flooding. Consequently, if the jury did not distinguish between the characteristic of a special benefit and how to measure its value, its failure to do so was invited by appellant's own witnesses. In short, if the jury was misled into believing that the cost of a suitable levee to protect respondent's land against inundation was the measure of value of the special benefit it derived from the construction of the Eastside By-Pass, the misconception was engendered in the case by appellant, and it cannot complain under the doctrine of invited error (*Bondulich* v. *O. E. Anderson Co.,* 210 Cal.App. 2d 12  17 [26 Cal.Rptr. 147]).[6]

In any event, as we have repeatedly stated, appellant's witnesses did not precisely relate their opinions of the value of the special benefit to market value. On the contrary. it is crystal clear that at least one witness (Mr. Willmette) did not use market value as the criterion. Appellant merely suggests that when the witness stated that the value of the special benefit to defendant's land was $90,000, he meant that this was the increase in the market value. Thus, appellant argues that the reasons which he gave, albeit incompetent to establish market value, went to the weight, not the validity, of his opinion. By the same token then, it is arguable that when Mr. Roduner stated it would have cost respondent around $2,000 to build a levee to protect its land against inundation, he meant that this was the only increase in the land's market value, and his reasons went to the weight, not the validity, of

[5]Lloyd Roduner testified that respondent could have built a levee by using its own employees and equipment. He estimated the number of hours required to build the levee. The jury obviously believed his testimony but rounded out the cost at $2,000.

[6]In the *Bondulich* case, a somewhat analogous situation, the trial court applied the wrong standard in determining appellant's liability. However, it was held that appellant could not complain on appeal because he had invited the error.

the opinion. If this is true, the jury's verdict was well within the range of the expert testimony.[7]

Appellant's second contention for reversal is that the court erred when it rejected appellant's photographs depicting the condition of respondent's land as of the time of trial; respondent's objection to the photographs was apparently sustained by the court on the ground that appellant was attempting to show an "after" condition of the property contrary to Code of Civil Procedure section 1248. However, appellant argues that the photographs were relevant on the issue of the special benefit to show the increased adaptability of respondent's land for agricultural purposes, which appellant claimed had resulted from the construction of the public improvement.

Appellant's argument on this point is persuasive. However, if error occurred, the error was harmless and does not require reversal of the judgment (Cal. Const. art. VI, § 13). The jurors saw a photograph of the "before" condition of the land. They also viewed the land during the trial and hence were able to make a comparison between its "before" and "after" condition. Moreover, the jurors heard all of the testimony of the expert witnesses on this issue. Thus, it is hardly likely that the jury would have reached a different verdict had the jurors seen the photographs to which appellant refers.

Appellant's last contention is that the court erred when it denied appellant's offer to prove that respondent enjoyed a special benefit from the construction of certain ditches and a siphon which enabled respondent to irrigate its lands in a manner not previously possible. Specifically, appellant attempted to prove that respondent had drilled several wells on the one side of the by-pass and was able to irrigate its land on the other side by availing itself of the siphon which passed underneath the new channel. The court ruled, however, that these improvements were constructed pursuant to a special agreement in which respondent had given up certain riparian and other water rights in Ash Slough. In short, the court ruled that respondent paid for any benefit which it may have received from the construction of the ditches and the siphon by relinquishing certain valuable water rights under a separate agreement, and that the jury could not con-

[7]Mr. Roduner was not only an officer of the corporation, but he had earlier qualified as an expert witness. He testified that he had special knowledge of the subject land and gave his opinion on the value of the land taken.

sider this benefit since defendant was not then claiming the loss of its water rights as a part of the severance damages.[8]

Appellant does not seriously contend that the court's interpretation of the special agreement between appellant and respondent is palpably erroneous. On the contrary, appellant

[8]The agreement to which the trial court referred reads in pertinent part as follows:

"Now, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

1. That District shall construct the following items in conjunction with the above mentioned Flood Control Project on the said hereinafter described real property of Corporation:

(a) Drain pipe through the proposed levee at the hereinafter Engineering Stations as said stations are shown on Department of Water Resources' maps entitled 'Lower San Joaquin River Flood Control Project, Interchange area to Avenue 18½', Sheets 1 through 37, Eastside Bypass Stations—Right Bank 588+50, 450+60, 468+60, 518+80 and 546+40—Left Bank Stations 460+00 (36" with riser unit).

(b) Levee road ramps as shown on the above referred to maps. Ash Slough Stations right bank 21+10 (W.S. & L.S., plus channel crossing as shown on the sketch herein attached as Appendix B and entitled 'San Joaquin River Flood Control Project—Proposed Roduner Irrigation Facilities' dated May 15, 1963, and revised July 10, 1963), and made a part of this contract and 50+00 (L.S.) Ash Slough Stations Left Bank 25+00 (W.S. & L.S., and 1+70 (L.S. & W.S.)

Eastside Bypass Stations, right bank 587+70 (L.S. & W.S.), 561+80 (L.S. & W.S., plus channel crossing as shown on Appendix B and provide a 24" pipe under landside road ramp for drainage), 540+00 (L.S. & W.S.), 462+80 (L.S. & W.S.) 503+40 (L.S. & W.S.), Eastside Bypass Stations left bank 409+10 (L.S.), 421+60 (L.S. & W.S.), 461+70 (L.S. & W.S., plus channel cross as shown in Appendix B), 510+50 (L.S. & W.S.), and 532+00 (L.S. & W.S.).

(c) Structures for the conveyance of Ash Slough water as shown on the attached Appendix B, including extension of the existing 24" underground irrigation pipe as shown on said Appendix B, except syphon is to be located just down stream of Station 509+00 left bank Eastside Bypass Stations.

IT IS FURTHER AGREED the District shall pay the Corporation the sum of $1,500.00 and that the Corporation shall accept said sum as full and final payment as an in lieu payment and all claims for damages resulting from the District not constructing an irrigation ditch along the easterly levee of Ash Slough and the Eastside Bypass between the southerly end of the proposed ditch and the proposed syphon head structure as said ditch and syphon are shown on Appendix B.

IT IS FURTHER AGREED that in consideration of the District's construction of the said above structures, Corporation, its assigns and successors hereby and herewith waive any and all claims for damages which may arise from or connected with the construction of the Flood Control Project Structures on the herein described lands of Corporation (See Appendix A) including any claims for damages resulting from interference with any water rights, or access and drainage rights of Corporation, appurtenant to any part of Corporation's lands described in Appendix A, and any and all lands of Corporation contiguous thereto; . . ."

is foreclosed from doing so for at its request the court instructed the jury as follows: ''Now, in connection with severance, before the commencement of this trial the parties entered into an agreement relating to the rights of the Roduner corporation to use water from Ash Slough. As a result of the agreement, the question of the use of Ash Slough water by the Roduner corporation after the construction of the project is not before you. You asked a question about this yesterday, and we told you that the question of water rights and use is not in issue and not to be taken into account in assessing damages. In assessing severance damages, you are not to consider how the Roduner corporation will now use Ash Slough water.'' Manifestly, if any severance damage which resulted from respondent's loss of its riparian right in Ash Slough was not in issue because of the separate agreement which respondent made with appellant, as the instruction states, it would also necessarily follow that any benefit, *direct* or *indirect*, that respondent may have received from the construction of the improvements referred to in the agreement was also not in issue. In other words, even if it is assumed *arguendo* that the structures referred to in the agreement were constructed primarily for the purpose of taking care of appellant's riparian rights and that respondent's use of the siphon to irrigate its land with water taken out of water wells was incidental to this main purpose, as appellant asserts, the water well irrigation was nevertheless an incidental benefit which arose from the special contract and hence was part of the overall consideration of that contract.

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred.