[No. S051436. Aug. 25, 1997.]

LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, Plaintiff and Appellant, v.
CONTINENTAL DEVELOPMENT CORPORATION, Defendant and Appellant.

**COUNSEL**

Nossaman, Guthner, Knox & Elliott, Mary Lou Byrne, Abraham C. Meltzer and James C. Powers for Plaintiff and Appellant.

James K. Hahn, City Attorney (Los Angeles), Patricia V. Tubert, Assistant City Attorney, and Kenneth Cirlin, Deputy City Attorney, as Amici Curiae on behalf of Plaintiff and Appellant.

Palmieri, Tyler, Wiener, Wilhelm & Waldron, Angelo J. Palmieri, Bruce W. Dannemeyer and Frank C. Rothrock for Defendant and Appellant.

James S. Burling, Stephen E. Abraham, Sullivan, Workman & Dee, Henry K. Workman, Berger & Norton and Gideon Kanner as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**WERDEGAR, J.**—The taking of private property in eminent domain is constrained by the California Constitution, which provides in relevant part that "[p]rivate property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." (Cal. Const., art. I, § 19; see also U.S. Const., Amends. V, XIV.) By statute, the owner of property acquired by eminent domain is entitled to the fair market value of the property taken. (Code Civ. Proc., §§ 1263.010, 1263.310.)[1] When the property taken is part of a larger parcel, in addition to being compensated for the part taken, the owner is compensated for the injury, if any, to the remainder. (§ 1263.410, subd. (a).) Compensation for injury to the remainder is the amount of the damage to the remainder, or severance damages, reduced by the amount of benefit to the remainder. (§ 1263.410, subd. (b).)

In the early eminent domain case of *Beveridge* v. *Lewis* (1902) 137 Cal. 619 [70 P. 1083] (*Beveridge*), this court distinguished between different types of benefits to remainder property. We stated: "Benefits are said to be of two kinds, general and special. General benefits consist in an increase in the value of land common to the community generally, from advantages which will accrue to the community from the improvement. . . . [¶] Special benefits are such as result from the mere construction of the improvement, and are peculiar to the land in question." (*Id.* at pp. 623-624.) Only special benefits, we concluded, may be set off against severance damages. (*Id.* at p. 624.) Later cases have reiterated the distinction. (See, e.g., *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282 [74 Cal.Rptr. 521, 449 P.2d 737] (*Pierpont Inn*).)

Here, the Los Angeles County Metropolitan Transportation Authority (the MTA) brought a condemnation action to acquire a narrow strip of land for an easement along one side of a parcel owned by Continental Development Corporation (Continental) for the construction of a portion of an elevated

---

[1]Unless otherwise noted, further statutory references are to the Code of Civil Procedure.

light rail line known as the Green Line. The Douglas Street Green Line station is located within a 10-minute walk from Continental's property.

In pretrial proceedings relating to Continental's severance damages claim, the MTA proffered evidence that the value of office buildings in other localities increased as a result of their proximity to public transit stations, as well as expert testimony that the value of Continental's property would increase by several million dollars as a result of the operation of the line. The trial court ruled the evidence inadmissible; the court reasoned that proximity to the transit station was not a special benefit because it was shared by numerous properties in the vicinity and, therefore, was not a feature peculiar or special to Continental's property. At the conclusion of the trial, the jury returned a verdict awarding Continental compensation for the property taken and for severance damages. On the MTA's appeal from the ensuing judgment, the Court of Appeal affirmed.

The MTA sought review, contending the lower courts had erred in concluding no special benefit existed here and arguing that the very distinction between general and special benefits is unworkable, produces inconsistent results when applied in different cases, and should be abolished.

For the reasons discussed below, we conclude the distinction between general and special benefits no longer finds support in the reasons articulated at its inception. We further conclude this lack of support and the difficulties inherent in courts' efforts consistently to apply the distinction warrant overruling this aspect of *Beveridge* and its progeny. We therefore reverse the judgment and remand the case for a new trial on severance damages. For guidance on retrial, we further explain that the Court of Appeal erred in finding the trial court abused its discretion in denying Continental's motion for litigation expenses.

## FACTS

Continental owned a 14-acre parcel of land that was divided into 3 lots. One of the lots, the subject of these proceedings, is triangular in shape and approximately 4.43 acres in size. The lot is located on Rosecrans Avenue near Aviation Boulevard in the City of El Segundo. The property extends for some 655 feet along Rosecrans Avenue on the south and for some 785 feet along a railroad right-of-way on the northeast side. The third side of the triangle borders on other properties in an 86-acre corporate development known as Continental Park.

On September 4, 1990, the Los Angeles County Transportation Commission, the predecessor of the MTA, brought an eminent domain proceeding to

acquire three interests in a small part of the subject property. These three interests consist of an air rights easement for the area in which the Green Line guideway was constructed, a construction easement located under the air rights easement, and a small area taken in fee. The easements run along the entire northeast side of the property, approximately five feet in average width. The area of the fee is 373 square feet, located entirely within the area covered by the easements. When this suit was filed, the property was unimproved, although by the time of trial Continental had constructed a four-story office building on the site. At the time of trial, the Green Line had not yet begun operation.

Prior to trial, the court conducted a hearing to determine whether the MTA would be permitted to present evidence on the issue of severance damages that proximity to the Douglas Street Station was a special benefit that enhanced the value of Continental's remaining property. The question was decided on the parties' memoranda and declarations; no testimony was taken. Continental's appraiser, Joseph A. Hennessey, averred there were 565 separate parcels of property located within 1,700 feet of the Douglas Street Station, of which 7 were being condemned for the construction of the Green Line. Attached to the Hennessey declaration were two reports prepared for the MTA by consultants SGM Group and Desmond, Marcello & Amster. The SGM report sets forth its analysis of the effect on rents and property values of modern elevated rail lines in other cities. SGM found that buildings within walking distance of San Francisco Bay Area Rapid Transit (BART) stations enjoyed, on average, 11 percent lower vacancy rates and 20 percent higher rents than comparable buildings located beyond walking distance from BART stations. SGM concluded that location of the Douglas Street Station within walking distance of Continental's property enhanced its value by $4.1 million. The Desmond report concluded the value of Continental's property was enhanced by $3,760,000 due to proximity to the station.

The trial court ruled, however, that "[t]he benefit of being within walking distance of a rail transit station is merely the benefit of access. As such it confers no peculiar or unique benefit upon defendant's property." Accordingly, the court declined to permit introduction of evidence or cross-examination on the subject of enhancement in value to Continental's property resulting from such proximity. The MTA moved for reconsideration of the court's ruling, arguing that it would be mere speculation to attempt to predict future rents for Continental's property without taking into account all circumstances affecting future rent and future value, including the effect of proximity to a transit station. The court denied the motion, and the case proceeded to trial before a jury.

On the issue of compensation for the property taken, the MTA valued the fee and easements taken at $99,532; Continental introduced evidence they were worth $141,666. The jury awarded Continental a total of $106,356 for the taking; that award is not here at issue.

On the issue of severance damages, Continental sought recovery based on three factors: building redesign, noise mitigation, and visual impact.

Continental presented evidence it spent $23,123 to have plans redrawn to resite the building farther from the elevated line. The MTA essentially did not dispute that claim. Continental also presented evidence that, to sound-proof the portion of the building facing the elevated line, Continental laminated the windows on the northeast side and incurred related expenses. The parties disputed whether further soundproofing would ultimately be needed; the MTA contended the existing lamination would suffice, but Continental introduced evidence it would need to install double window-panes at a cost of over $400,000.

The major contested issue at trial was Continental's claimed damages stemming from the effect of the elevated line on views from offices on the northeast side of the building. Hennessey, Continental's appraiser, testified he believed those offices would command lower rents; he capitalized the projected lower rents to arrive at an opinion the property would lose $1,038,300 in value from the visual impact of the Green Line. The MTA presented the testimony of Lawrence Goldstein, who had studied the economic effects of urban transit lines on real estate values. Goldstein testified he compared rents for properties within 90 feet of elevated rail lines in Washington, D.C., and in areas served by the BART system in the San Francisco Bay Area, with rents of comparable properties located substantially farther from the lines. He concluded commercial office buildings located next to modern elevated rail lines suffered no decrease in rents.

The jury's total severance damages award was $1,015,793. Because the trial court denied the MTA's request for a special verdict form that would have required the jury to state separately the amounts awarded for different elements of severance damages, no such allocation was made. Nevertheless, assuming the jury awarded Continental the full amount it sought for noise mitigation ($416,604), it is clear a substantial part of the award represented damages for visual impact.

The MTA moved for a new trial, contending (1) the award of severance damages for visual impact was not supported by substantial evidence, (2) the trial court erred in refusing to allow the MTA, during its cross-examination

of Hennessey, to raise the issue of enhanced value to Continental's property resulting from proximity to a transit station, and (3) the trial court erred in refusing to admit evidence of such enhancement and in failing to instruct the jury to state separately in its verdict the amount of any benefits resulting from proximity to the station. The court denied the MTA's new trial motion; the court also denied Continental's motion for litigation expenses pursuant to section 1250.410. The Court of Appeal affirmed the judgment, but reversed the order denying Continental's motion.

DISCUSSION

*Just Compensation: Offset of Benefits Against Severance Damages*

"Just" compensation for severance damages has been defined in different ways during different periods in California history. The original formula for calculating just compensation in the case of a partial taking was articulated in the context of condemnation by a private railroad company. With the Railroad Act of 1861 (Stats. 1861, ch. DXXXII, § 30, p. 621 (the Railroad Act)), the Legislature had authorized private railroad companies to exercise the power of eminent domain, taking the view that in providing a means of transportation to isolated areas of the state, the railroads performed a public service. In *S. F., A. & S. R. R. Co.* v. *Caldwell* (1866) 31 Cal. 367 (*Caldwell*), a private railroad company condemned several tracts of land for the construction of a railroad. As prescribed by the Railroad Act, commissioners were appointed to take evidence and assess the compensation to be paid for the lands. The railroad company took exception to the assessment, arguing the commissioners erroneously failed to consider the benefits or advantages accruing to the landowners by reason of the construction of the railroad, despite the Railroad Act's express directive to do so. The lower courts denied relief, and the railroad company appealed to this court.

The Railroad Act directed that the value of any benefits accruing to the landowner's remaining property, as a result of the railway, be set off in full or partial satisfaction of the compensation owing for the property taken.[2] The central question in *Caldwell* was whether this provision unconstitutionally denied landowners just compensation. The *Caldwell* court observed:

---

[2]The Railroad Act, in permitting setoff of benefits against both compensation owing for the property taken and severance damages, thus employed a variation of the standard currently operative in federal condemnation law, i.e., what has become known as the before-and-after rule. (See *United States* v. *River Rouge Co.* (1926) 269 U.S. 411 [46 S.Ct. 144, 70 L.Ed. 339]; *Bauman* v. *Ross* (1897) 167 U.S. 548 [17 S.Ct. 966, 42 L.Ed. 270].) As discussed in the text, contrary to the before-and-after rule, under the present eminent domain statutes of this state benefits may be set off only against damage to the remaining property, not against compensation for the part taken. (§ 1263.410, subd. (b).) The current federal law of eminent domain

"The opinions of jurists on this subject are found, on examination, to be widely diverse from each other. On the one side it has been maintained that compensation to the extent of the value of the land taken must be made in all cases, without any deduction on account of any benefit or advantage which may accrue to other property of the owner, by reason of the public improvement for which the property is taken. [Citations.] [¶] In support of this view it is argued that the enhancement of the value of other property of the owner of the land proposed to be condemned to public use, which may be of the parcel of that taken, is merely the measure of such owner's share in the general good produced by the public improvement; and why, it is asked, is not the owner in such case justly entitled to the increase in the value of the property thus fortuitously occasioned, without paying for it? His share in the benefits resulting may be larger than falls to the lot of others owning property in the same vicinity, and it may not be so large, and yet he alone is made to contribute to the improvement by a deduction from the compensation which is awarded him by sovereign behest as a pure matter of right, though others whose property may adjoin the public work are equally with himself benefited by it. On the other side it is maintained that the public is only dealing with those whose property is necessarily taken for public use, and that if the property of such persons immediately connected with that taken, but which remains unappropriated, is enhanced in value by reason of the improvement then, thereby the owners receive a just compensation for the lands taken to the extent of such enhancement, and if thereby fully compensated they cannot in justice ask for anything more. [Citations.] [¶] The weight of authority appears to be in favor of allowing benefits and advantages to be considered in ascertaining what is a just compensation to be awarded in such cases, and it seems to us that the reasons in support of this view of the subject are unanswerable. [¶] Just compensation requires a full indemnity and nothing more. When the value of the benefit is ascertained there can be no valid reason assigned against estimating it as a part of the compensation rendered for the particular property taken, as all the Constitution secures in such cases is a just compensation, which is all that the owner of property taken for public use can justly demand." (*Caldwell, supra*, 31 Cal. at pp. 373-374.)

This court revisited the setoff issue in *California P.R.R. Co.* v. *Armstrong* (1873) 46 Cal. 85 (*Armstrong*). In *Armstrong*, the railroad company condemned a tract of land and obtained a court order for possession pending determination of just compensation. After construction of the railway, the commissioners estimated the value of the condemned land prior to the taking

provides for setoff of "special and direct" benefits against both severance damages and compensation for the taking. (See, e.g., 33 U.S.C. § 595 [improvement of waterways].)

at $403.50, and the value of the landowner's severance damages and general benefits each at $1,112.50. The landowner objected to the commissioners' valuation of the condemned land, urging the railroad company had entered on the property and built the railway without his permission, as a trespasser; as a consequence, he contended he should be awarded the cost of building the railway on the property as well as the value of the property. The landowner further objected to the commissioners' setoff against his severance damages of the enhanced value to the remainder land resulting from construction of the railway, arguing the enhancement was shared in common with other contiguous lands and therefore should not be set off. (*Id.* at pp. 89-90.)

The *Armstrong* court lost no time in rejecting the landowner's first proposition, that he was entitled to the cost of building the railroad on his land, noting: "Neither the Constitution nor the statute contemplates that a person, whose land is taken in the exercise of the right of eminent domain, shall be entitled to anything beyond a 'just compensation.' He is to be paid the damage he actually suffers, and nothing more." (46 Cal. at p. 90.)

The *Armstrong* court also rejected the landowner's second argument, that only special benefits should be set off against severance damages: "[T]here is no valid reason for this distinction. The theory of the statute is, that the land owner shall receive a fair, just compensation for the damage he suffers, and if that portion of his tract which is not taken will be enhanced in value by the construction of a railroad, his damages will be diminished to the extent of the enhancement, and hence the statute contemplates that by deducting this benefit from the damages, the sum which remains will constitute a 'just compensation' in the sense of the Constitution. This was the view of the question announced in the case of the *San Francisco, Alameda, and Stockton Railroad Company* v. *Caldwell*, 31 Cal. 367, which is decisive of this point." (*Armstrong, supra*, 46 Cal. at p. 91.)

The decisions in *Caldwell, supra*, 31 Cal. 367, and *Armstrong, supra*, 46 Cal. 85, thus endorse the principle that just compensation consists in no more and no less than making the landowner whole for the loss sustained as a result of the taking. That is, the landowner is to be "put in as good position pecuniarily as he would have occupied if his property had not been taken." (*United States* v. *Miller* (1943) 317 U.S. 369, 373 [63 S.Ct. 276, 279-280, 87 L.Ed. 336, 147 A.L.R. 55].) "He must be made whole but is not entitled to more." (*Olson* v. *United States* (1934) 292 U.S. 246, 255 [54 S.Ct. 704, 708, 78 L.Ed. 1236]; see also *Costa Mesa Union Sch. Dist.* v. *Security First Nat. Bk.* (1967) 254 Cal.App.2d 4, 10 [62 Cal.Rptr. 113].)

Some years later, in *Beveridge, supra,* 137 Cal. 619, this court construed former section 1248, relating to setoff, in light of the then existing just compensation clause, former article I, section 14 of the California Constitution, which had been enacted in 1879, after the decisions in *Armstrong, supra,* 46 Cal. 85, and *Caldwell, supra,* 31 Cal. 367. In so doing, the *Beveridge* court introduced into California decisional law for the first time the principle that benefits, to be eligible for setoff, must be "special" or "peculiar" to the remainder property.

Former section 1248, like present section 1263.410, authorized a setoff of "benefits," without limitation, in all cases in which property is taken for a public use. In contrast to the statutory provision, former article I, section 14 of the state Constitution provided: "Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for, the owner, and no right of way shall be appropriated to the use of any corporation *other than municipal* until *full compensation therefor be first made* in money or ascertained and paid into court for the owner, *irrespective of any benefit* from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in a court of record, as shall be prescribed by law." (Italics added.)

Article I, section 14 was added to the Constitution in reaction to the private railroad companies' speculative computation of benefits. (See Note, *Benefits and Just Compensation in California* (1969) 20 Hastings L.J. 764.) As noted above, the Railroad Act had invested private railroad companies with the power of eminent domain, inasmuch as providing a means of transportation to isolated areas of the state was viewed as a public service. At the same time, however, the railroad companies were operated for private gain. To minimize the cost of obtaining rights of way, railroad companies frequently would take a portion of a landowner's tract and, under the before-and-after rule of *Caldwell, supra,* 31 Cal. 367, would deem the benefit to the remainder property to exceed the fair value of the part taken, and thus would offer no monetary compensation for the taking. As the majority opinion in *Beveridge* describes this practice: "Prior to the adoption of the present constitution the supreme court had decided, in a case where it was found that there were no special benefits, but only general benefits as I have defined them, that such benefits could be set off against damages, and that by this rule the owner was *fully compensated. (California Pac. R. R. Co. v. Armstrong,* 46 Cal. 85.) By section 14, involved here, I believe the people intended to overrule this case and other like decisions, *so far as applicable to private railroad corporations.*" (*Beveridge, supra,* 137 Cal. at p. 624, italics added.)

Examination of the constitutional debates of 1878 generally confirms that, as relevant here, the framers' intent with respect to former article I, section 14 of the Caifornia Constitution was to preclude private railroad companies both from taking land without first compensating the owner and from setting off from the damages owed any benefits to the remainder. (See Cal. Const., former art. I, § 14; 1 Debates & Proceedings, Cal. Const. Convention (1878-1879) p. 346 et seq. (Debates & Proceedings).) Delegate James M. Dudley of Solano, who offered the amendment that, as revised, was adopted as former article I, section 14, successfully moved for inclusion of the phrase "other than municipal" after the word "corporation" so as to exempt municipalities from the provision, thereby allaying the concern of other delegates that, as originally drafted, the amendment would have unduly hindered the development of county roads, town streets, and other government-sponsored public works. (Debates & Proceedings, *supra*, pp. 347, 349.)

It is in light of this history that we must read the *Beveridge* court's analysis of the distinction between general and special benefits. In *Beveridge*, the court addressed two issues. Plaintiff Philo J. Beveridge, an agent for the Los Angeles Pacific Railway, instituted the condemnation proceedings to secure a right-of-way over defendant Mary Lewis's land solely in order to convey it to the railway, which planned to build, own, and operate a railroad. In assessing the compensation due a landowner, former section 1248, as mentioned, authorized setoff of all benefits, "in all cases." Lewis, in an effort to avoid any setoff, sought to introduce evidence of Beveridge's status as an agent for the railway, on the theory that under former article I, section 14 of the California Constitution, setoff of benefits in condemnation actions by corporations "other than municipal" was precluded.

Acknowledging the difference between the constitutional provision's prohibition against setoff when the condemner was a private corporation and the statute's uniform rule of setoff in all cases, the *Beveridge* court first considered whether state constitutional equal protection principles would permit awarding a lesser sum to a landowner whose property was taken by a natural person than that awarded a landowner whose property was taken by a private corporation, especially when the natural person could immediately transfer the property to a corporation. The *Beveridge* court concluded such a result was constitutionally impermissible. (*Beveridge, supra,* 137 Cal. at p. 623.) The court thus held that, despite California Constitution, former article I, section 14's complete ban on offsets in the case of condemnations by private corporations, landowners must receive the same compensation regardless of the nature of the condemning entity. (137 Cal. at p. 623.)

The *Beveridge* court then turned to the question that concerns us, i.e., *what* benefits must be set off in calculating an award for severance damages. The

court commenced its analysis by returning to what might be termed the first principle of takings law, that a landowner must receive "just compensation" for a taking. The court noted that a compensation law, to be valid, must at the least fully compensate the owner, it must apply uniformly, and it must compensate in money, rather than "conjectured advantage." (*Beveridge, supra*, 137 Cal. at p. 623.)

Against this background, in particular the prohibition against compensation in the form of "conjectured advantage," the *Beveridge* court turned its attention to the distinction between general and special benefits. "Benefits are said to be of two kinds, general and special," the court observed. (*Beveridge, supra*, 137 Cal. at p. 623.) "General benefits consist in an increase in the value of the land common to the community generally, from advantages which will accrue to the community from the improvement. [Citation.] They are conjectural and incapable of estimation. They may never be realized, and in such case the property-owner has not been compensated save by the sanguine promise of the promoter." (*Beveridge, supra*, 137 Cal. at pp. 623-624.) Special benefits, by contrast, are "such as result from the mere construction of the improvement" (*id.* at p. 624), or, in other words, "reasonably certain to result from the construction of the work" (*id.* at p. 626), and are "*peculiar to the land in question*" (*id.* at p. 624, italics added).

Thus, the *Beveridge* court distinguished general and special benefits along two distinct dimensions: generality versus peculiarity and conjecture versus certainty. The opinion does not, however, definitively state whether, to support a finding of a "general" benefit, the value of an alleged enhancement must *both* be conjectural or uncertain *and* lack peculiarity to the remainder property, or whether lack of peculiarity alone would suffice. That is, *Beveridge* does not resolve whether a reasonably certain, nonspeculative, nonconjectural enhancement that is not peculiar to the property in question, but is shared by a number of properties in the neighborhood, can nevertheless constitute a special benefit.

As indicated, the *Beveridge* court described special benefits as "peculiar to the land in question." Although the term "peculiarity" connotes singularity or uniqueness, it also refers to the characteristic of belonging especially or exclusively to a particular *group*. (See Webster's New Internat. Dict. (2d ed. 1958) p. 1801.) The parties agree a benefit need not be absolutely unique to the property in order to be considered special. That consensus scarcely advances our inquiry, however, as *Beveridge* gives no direction as to how widely a benefit may be shared and still be considered special rather than general.

Related to the ambiguity of the term "peculiar" is the *Beveridge* court's failure to define the "community" relevant to the determination of general or special benefits, whether as the immediate neighborhood of the affected property, the town or city in which it is located, or, more broadly, the county or region. The more expansively the community is defined, the more likely the benefit will be deemed peculiar and, hence, a special benefit entitling the condemner to a setoff. In the present case, for example, if the relevant community is defined as those properties within walking distance of the Douglas Street Station, then the benefit of proximity is universally shared within the community and is thus self-evidently general. If, on the other hand, we define the relevant community as the greater Los Angeles metropolitan area (as we might do if our conception of community includes all those whose taxes presumably help pay for the transit system and all who might be expected to use it), then the benefit of proximity begins to appear much more peculiar to properties, such as Continental's, that are within walking distance of the Douglas Street Station.

Since *Beveridge* was decided, we have not attempted to clarify the rule it announced. Our most recent decision bearing on the general/special benefit dichotomy, *Pierpont Inn, supra,* 70 Cal.2d 282, merely applied *Beveridge* without providing additional guidance. In that case, a freeway off-ramp near the property in question was deemed a general benefit, the court merely noting "the same benefit . . . was received by 'all the properties in the vicinity' and . . . it was not 'special or peculiar only to Pierpont Inn.' " (*Id.* at pp. 295-296.) Beyond culling from *Beveridge* and *Pierpont Inn* two polarized sets of adjectives describing general and special benefits, Continental does not assist us in framing a test that is capable of easier or more predictable application.

The difficulty of the distinction has been widely remarked. As then Presiding Justice Richardson said, in his opinion for the Court of Appeal, Third Appellate District, in *People* ex rel. *Dept. Pub. Wks.* v. *Giumarra Farms, Inc.* (1971) 22 Cal.App.3d 98 [99 Cal.Rptr. 272] (*Giumarra Farms*): "The enunciation of the [*Beveridge*] rule . . . has proven somewhat easier than its application. . . . The application of the *Beveridge* principle has not been uniform and it has been criticized as causing 'confusion.' (See Gleaves, *Special Benefits in Eminent Domain, Phantom of the Opera* (1965) 40 State Bar J. 245, 249.) [¶] Nor has there been uniformity of opinion in other jurisdictions as to what constitutes benefits chargeable against the landowner in a condemnation action. 'Upon this subject there is a great diversity of opinion and more rules, different from and inconsistent with each other, have been laid down than upon any other point in the law of eminent

domain.' (3 Nichols on Eminent Domain 57.)" (*Giumarra Farms, supra,* 22 Cal.App.3d at p. 104; see also *State* ex rel. *State Highway Com'n* v. *Gatson* (Mo.Ct.App. 1981) 617 S.W.2d 80, 82 ["It has been said that trained legal minds have difficulty in distinguishing between the two types of benefits."]; *State* ex rel. *State Highway Com'n* v. *Koziatek* (Mo.Ct.App. 1982) 639 S.W.2d 86, 88 ["[T]he distinction between special benefits and general benefits is shadowy at best."].)

The difficulty of determining whether a particular benefit is special or general, and the resulting inconsistency among published decisions on the subject, is clear in a comparison of the present case with earlier cases in which the benefit was that of enhanced access to the property. In *City of Hayward* v. *Unger* (1961) 194 Cal.App.2d 516 [15 Cal.Rptr. 301], for example, the city widened a street in the block on which the subject property was located. In rejecting the landowner's contention the ensuing improvement of access to the property was a general benefit as a matter of law, the Court of Appeal cited expert testimony establishing that the widening of the street increased the flow of traffic past the property, and thus specially benefited it. (*Id.* at pp. 517-518.) Likewise, in *Los Angeles* v. *Marblehead Land Co.* (1928) 95 Cal.App. 602, 614-615 [273 P. 131], the Court of Appeal concluded the evidence supported the trial court's finding of special benefits for enhanced access resulting from the construction of a highway through the subject property. In *Pierpont Inn, supra,* 70 Cal.2d 282, by contrast, we upheld a finding of no special benefit for enhanced access resulting from the construction of a freeway and offramp in the vicinity of the subject property (*id.* at pp. 295-296), and, of course, the lower courts in the present case came to the same conclusion regarding the enhanced access to Continental's property from proximity to the Douglas Street station. (See also *Orpheum Bldg. Co.* v. *San Francisco Bay Area Rapid Transit Dist.* (1978) 80 Cal.App.3d 863, 874 [146 Cal.Rptr. 5] [observing, in dicta, that jury found property owner was specially benefited by proximity to transit station].) Even if, as Continental and the concurring and dissenting opinion of Justice Kennard suggest, factual differences among these apparently similar situations justify these apparently conflicting results, it is difficult to glean from the results in these individual cases a helpful rule of general application.

■ The MTA suggests section 1263.450, which became operative in 1976, is inconsistent with the *Beveridge* rule distinguishing general and special benefits. That statute provides as follows: "Compensation for the injury to the remainder shall be based on the project as proposed. Any features of the project which mitigate the damage or provide benefit to the remainder, including but not limited to easements, crossings, underpasses,

access roads, fencing, drainage facilities, and cattle guards, shall be taken into account in determining the compensation for injury to the remainder." The MTA implicitly reasons that because the statute does not limit the fact finder to consideration of beneficial project features not affecting neighboring properties, adherence to the *Beveridge* rule would diverge from the apparent legislative intent. This point is unpersuasive. As Continental points out, the Law Revision Commission comment to section 1263.450 focuses on consideration of "physical solutions" devised by the condemner to mitigate damages. (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1263.450, p. 84.) Moreover, as Continental further notes, the Law Revision Commission comment to section 1263.430, the statute defining "benefit to the remainder" for purposes of offsetting severance damages, professes to "codif[y] prior law" and "does not abrogate any court-developed rules relating to the offset of benefits nor does it impair the ability of the courts to continue to develop the law in this area. See *Beveridge* v. *Lewis*, 137 Cal. 619, 70 P. 1083 (1902) (only 'special' benefits may be offset.)." (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc., *supra*, foll. § 1263.430, p. 82.) The Legislature thus has recognized this court's continuing power, within the bounds set by relevant constitutional and statutory language, to develop the law pertaining to offsets just as the court developed the *Beveridge* rule almost a century ago.

The MTA further argues that the *Beveridge* court's emphasis on the conjectural nature of general benefits suggests the salient difference between general and special damages lies in whether they are speculative, on one hand, or probable and provable, on the other. The MTA points out that, at various points in its opinion, the *Beveridge* majority appeared to equate general benefits with those that are "uncertain, incapable of estimation, and future," while identifying special benefits as those reasonably certain to result from the construction of the work. (E.g., *Beveridge*, *supra*, 137 Cal. at pp. 624-626 ["The property-owner, therefore, cannot be compelled to receive his compensation in such vague speculations as to future advantages, in which a jury may be induced to indulge."].) The MTA contends the *Beveridge* court sought to prevent frustration of the right to just compensation by precluding setoff of asserted benefits that might never materialize. Consequently, the MTA suggests, when the evidence shows the property will enjoy immediate advantage from the improvement, the benefit should be held special regardless of how many other properties are similarly affected.

As the constitutional debates previously referred to demonstrate, the evil that primarily concerned the framers of former article I, section 14 of the California Constitution and to which the *Beveridge* court responded, was the

railroad companies' practice of taking property and paying owners no money in return, on the mere promise of future economic growth. Current law, however, entitles an owner to the fair market value of any property taken, *without setoff* (§§ 1263.010, 1263.410); thus, because today no taking per se may go uncompensated, irrespective of any benefit to the remaining property, the sharp practices of the 19th century railroad corporations have no close analogue.

One amicus curiae, however, argues the problem of the 19th century "sanguine promoter" (see *Beveridge, supra,* 137 Cal. at p. 624) continues to exist, given that in some instances property has been taken for a public work that was never completed or that was abandoned after its completion. Amicus curiae thus suggests that a rule that would permit setoff of general benefits would remain potentially unfair. The argument proves too much, however: Both special benefits and severance damages likewise may not materialize, or may cease to exist, for the same reason. ▮▮ Valuation to an absolute certainty has never been required in arriving at just compensation. The demands of fairness are satisfied when compensation is determined on the basis of substantial evidence establishing, to a reasonable certainty, the value of the property taken and the net effect on the remainder property's value of benefits and detriments resulting from the project. (See *People* v. *McReynolds* (1939) 31 Cal.App.2d 219, 223 [87 P.2d 734].) Moreover, if a landowner's property enjoys improved access as a result of a public improvement and the state were later to take away that access, it may be, as the Court of Appeal observed in *People* ex rel. *Dept. of Public Works* v. *Edgar* (1963) 219 Cal.App.2d 381, 389 [32 Cal.Rptr. 892], that compensation through a new condemnation action would become due. We thus reject the broad argument that today, as before, fairness precludes setoff of any general benefits because they may never be realized. Nevertheless, the absence today of the historical conditions prevailing at the time *Beveridge* was decided, although a factor to consider, does not necessarily compel the conclusion the rule of that case should be abandoned.

The *Beveridge* majority advanced another rationale for its rule against setting off general benefits: "The chance that land will increase in value as population increases and new facilities for transportation and new markets are created is an element of value quite generally taken into consideration in the purchase of land in estimating its present market value. This chance for gain is the property of the land-owner. If a part of his property is taken for the construction of the railway, he stands in reference to the other property not taken like similar property-owners in the neighborhood. His neighbors are not required to surrender this prospective enhancement of value in order

to secure the increased facilities which the railroad will afford. If he is compelled to contribute all that he could possibly gain by the improvement, while others in all respects similarly affected by it are not required to do so, he does not receive the equal protection of the law. The work is not being done for his benefit, but for the pecuniary advantage of those who are constructing it. The law will not imply a promise on his part to pay anything toward it." (*Beveridge, supra*, 137 Cal. at p. 625.) Relying on this alternative rationale, Continental contends that a rule permitting setoff of all benefits against severance damages would constitute a violation of equal protection principles.

Continental's equal protection argument is flawed in that it fails to account for a significant difference, in terms of the availability of compensation for the detrimental effects of the Green Line, between Continental and its neighbors from whom no property is taken. Having had part of its property condemned, Continental is entitled to severance damages, whereas its neighbors are not. Severance damages, as noted, consist generally of the diminution in the fair market value of the remainder property caused by the project. (§ 1263.420.) █ As we said in *Pierpont Inn, supra*, 70 Cal.2d at page 295, "Where the property taken constitutes only a part of a larger parcel, the owner is entitled to recover, *inter alia*, the difference in the fair market value of his property in its 'before' condition and the fair market value of the remaining portion thereof after the construction of the improvement on the portion taken. Items such as view, access to beach property, freedom from noise, etc. are unquestionably matters which a willing buyer in the open market would consider in determining the price he would pay for any given piece of real property." (See also *City of Salinas* v. *Homer* (1980) 106 Cal.App.3d 307, 312 [165 Cal.Rptr. 65].) Severance damages are not limited to special and direct damages, but can be based on any factor, resulting from the project, that causes a decline in the fair market value of the property. (*San Diego Gas & Electric Co.* v. *Daley* (1988) 205 Cal.App.3d 1334, 1345 [253 Cal.Rptr. 144].)

Although Continental urges that severance damages, like offsettable benefits, must be "special," the landowner seeking severance damages need only prove the value of his or her property has been impaired, not that other members of the public are not similarly affected. (Cf. *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 349 [144 P.2d 818] (*Bacich*).) In *Bacich* we reasoned as follows: "The major issue presented in this case is whether or not plaintiff may recover compensation [in inverse condemnation] under the constitutional provision (Cal. Const., art. I, [former] sec. 14) in the light of the facts stated by him. He is entitled thereto under the wording of that

provision if his property has been taken or damaged for a public use. The solution of that question depends largely upon the character and extent of his property right. If he has a property right and it has been impaired or damaged, he may recover. The test frequently mentioned by the authorities, that he may recover if he has suffered a damage peculiar to himself and different in kind, as differentiated from degree, from that suffered by the public generally, is of no assistance in the solution of the problem. *If he has a property right and it has been impaired, the damage is necessarily peculiar to himself and is different in kind from that suffered by him as a member of the public or by the public generally, for his particular property right as a property owner and not as a member of the public has been damaged."* (23 Cal.2d at p. 349, italics added.) Similarly, in direct condemnation cases such as this one, the Eminent Domain Law contains no requirement the landowner prove his or her severance damages are of a type not shared by neighboring landowners.[3]

Nothing in *City of Berkeley* v. *Von Adelung* (1963) 214 Cal.App.2d 791 [29 Cal.Rptr. 802] requires a different conclusion. Although the Court of Appeal in that case stated a claimed injury to the landowner's property was noncompensable because "it is general to all property owners in the neighborhood, and not special to defendant" (*id.* at p. 793), nothing in the opinion indicates the landowner presented evidence of a diminution in the value of the remainder property. (*Ibid.* ["At most, defendant's offered proof would show only that the project as a whole would increase traffic flow past his lot."]; cf. *Rose* v. *State of California* (1942) 19 Cal.2d 713, 737-742 [123 P.2d 505] [no compensation for diversion of traffic, as distinct from impairment of access to adjacent thoroughfare, because landowner has no legal right that is infringed by changing the flow of traffic past his or her property]; *Friends of H Street* v. *City of Sacramento* (1993) 20 Cal.App.4th 152, 166-167 [24 Cal.Rptr.2d 607].)

█ The recovery of neighboring landowners in an inverse condemnation or nuisance action, in contrast, requires more than a showing that the value of the property has diminished as a result of the project: Such landowners must establish that the consequences of the project are "not far removed" from a direct physical intrusion or amount to a nuisance (see *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 297 [142 Cal.Rptr. 429, 572 P.2d 43] [gaseous effluent from sewage treatment facility having effects not far from

---

[3]We do not read *Bacich, supra,* 23 Cal.2d 343, so narrowly as does the concurring and dissenting opinion of Justice Kennard, *post,* at page 734, footnote 2, which, we observe, does not, in any event, contend the result in this case denies Continental just compensation within the meaning of article I, section 19 of the California Constitution.

direct physical invasion of plaintiff's property]; see also *Baker* v. *Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 866-868 [218 Cal.Rptr. 293, 705 P.2d 866] [homeowners' nuisance and inverse condemnation claims for commercial airport noise and vibrations]), or that the project results in actual physical injury to the property, as opposed to mere diminution in its enjoyment (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 258-263 [42 Cal.Rptr. 89, 398 P.2d 129]; *People* ex rel. *Dept. Pub. Wks.* v. *Ramos* (1969) 1 Cal.3d 261, 264 [81 Cal.Rptr. 792, 460 P.2d 992] [noting, in dictum, that absent taking or physical damage to property, owner generally not entitled to recover damages for detrimental effects of public project]; see also *Hilltop Properties* v. *State of California* (1965) 233 Cal.App.2d 349, 355 [43 Cal.Rptr. 605] [inverse condemnation includes permanent or temporary deprivation of use or enjoyment of land and may consist of dispossession, appropriation, destruction or damage]). Here, we do not understand Continental to argue that the concomitants of the Green Line's operation approach the level of a nuisance or an intrusion or actual physical damage to the neighboring property. Those of Continental's neighbors from whom no property is taken therefore do not necessarily share Continental's right to recover for any and all diminution in the value of their property caused by the Green Line's noise and visual impact.

As the *Beveridge* majority appears not to have considered the differing availability of damages for the detrimental effects of public works projects as between the landowner in condemnation proceedings and the neighbor from whom no property is taken, its reasoning should not be read as an authoritative statement about the requirements in this context of the equal protection clause of the California Constitution. (Cf. *Meehan* v. *Hopps* (1955) 45 Cal.2d 213, 218 [288 P.2d 267] [absent any indication parties argued, or court considered, point in question, court's conclusion not authoritative].)[4]  We believe the principle that *Beveridge* (and Continental) label equal protection is more properly considered as an aspect of the fairness encompassed within the concept of just compensation, which we shall next consider.

[4]We note, too, that whereas the *Beveridge* majority was concerned with the prospect of "corporations other than municipal" (Cal. Const., former art. I, § 14) taking property without compensating owners therefor and constructing railroads that those corporations proceeded to operate for their own "pecuniary advantage" (137 Cal. at p. 625), nothing before us suggests the MTA can be so categorized. As demonstrated above, the framers of former article I, section 14 evidently did not wish to hinder the construction of government-sponsored public works, of which the Green Line is one. (See also *Beveridge, supra,* 137 Cal. at p. 626 (dis. opn. of McFarland, J.) ["[I]n my judgment, the intent of section 14 of article I of our state constitution to discriminate against corporations other than municipal, and against them alone, is so obvious as to leave no room for doubt on the subject."].)

The just compensation clause, as discussed above, is primarily aimed at making a landowner whole for any governmental taking or damage to his or her property. Indeed, certain language in opinions arising under this provision suggests that as long as Continental is fully compensated for the taking of its property and for loss in property value resulting from the project, it can have no complaint. As *Caldwell* acknowledged, "Just compensation requires a full indemnity and nothing more." (*Caldwell, supra,* 31 Cal. at p. 374.) Similarly, *Armstrong* recognized that "[n]either the Constitution nor the statute contemplates that a person, whose land is taken in the exercise of the right of eminent domain, shall be entitled to anything beyond a 'just compensation.' He is to be paid the damage he actually suffers, and nothing more." (*Armstrong, supra,* 46 Cal. at p. 90.)

The United States Supreme Court has written to the same effect in *Bauman* v. *Ross, supra,* 167 U.S. at page 574 [17 S.Ct. at page 976], stating, "The just compensation required by the Constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." And in *McCoy* v. *Union Elevated R. R. Co.* (1918) 247 U.S. 354 [38 S.Ct. 504, 62 L.Ed. 1156], the high court said: "The fundamental right guaranteed by the Fourteenth Amendment is that the owner shall not be deprived of the market value of his property under a rule of law which makes it impossible for him to obtain just compensation. There is no guarantee that he shall derive a positive pecuniary advantage from a public work whenever a neighbor does. It is almost universally held that in arriving at the amount of damage to property not taken allowance should be made for peculiar and individual benefits conferred upon it—compensation to the owner in that form is permissible. And we are unable to say that he suffers deprivation of any fundamental right when a State goes one step further and permits consideration of actual benefits—enhancement in market value—flowing directly from a public work, although all in the neighborhood receive like advantages. In such case the owner really loses nothing which he had before; and it may be said, with reason, there has been no real injury." (*Id.* at pp. 365-366 [38 S.Ct. at pp. 507-508].)

Yet these principles may be said to collide with another value implicit in the just compensation clause. We have recognized that the policy underlying the just compensation clause is to ensure that the owner of damaged property is not forced to " ' "contribute more than his proper share to the public undertaking" ' "; in other words, the clause aims " ' "to distribute throughout the community the loss inflicted upon the individual by the making of the

public improvements". . .' " (*Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327, 365 [27 Cal.Rptr.2d 613, 867 P.2d 724]; see also *Customer Co.* v. *City of Sacramento* (1995) 10 Cal.4th 368, 409 [41 Cal.Rptr.2d 658, 895 P.2d 900] (dis. opn. of Baxter, J.) and cases cited therein).) Arguably, if setoff against severance damages is permitted of all benefits flowing from the project, the landowner does suffer a loss of his or her expectation, shared with neighboring owners and which they retain, of appreciation in the property's value stemming from the public work. In considering whether to adopt a rule that would permit offset against severance damages of all reasonably certain enhancement in the value of the property, as the MTA urges, we therefore must ask whether Continental would thereby be forced to contribute more than its proper share to the construction and operation of the transit project.

In examining this question, we are forced to confront an obdurate fact: Applying existing rules, to distribute the cost of this project across the community with perfect equality is impossible. If Continental is subjected to setoff of general benefits resulting from proximity to the Douglas Street station, one might say it pays more than its proper share of the cost of this transit project because it loses an expectation of gain that other property owners, from whom no land is taken, are allowed to keep. If, on the other hand, Continental is permitted both to recover severance damages and to retain the general enhancement in the value of its property, one could with equal validity say it thereby pays *less* than its proper share of the project cost vis-à-vis those property owners from whom no property is taken, and who cannot recover damages for the diminution in the value of their property resulting from the operation of the transit line, when those effects are not sufficiently deleterious to support an action in inverse condemnation or nuisance. The law has no mechanism by which to ensure an absolutely fair distribution of costs and benefits across the entire community. We must instead search for the rule of greatest relative fairness, or least unfairness.

One general principle relevant to this determination is that taxpayers should not be required to pay more than reasonably necessary for public works projects. Stated another way, compensation for taking or damage to property must be just to the public as well as to the landowner. (*United States* v. *Commodities Corp.* (1950) 339 U.S. 121, 123 [70 S.Ct. 547, 549, 94 L.Ed. 707].) A rule permitting setoff against severance damages of all reasonably certain and nonspeculative benefits minimizes the cost of public works projects in two respects: Certain offsets would be permitted that presently are disallowed, and transaction costs would be reduced due to the new rule's greater clarity and certainty.

Another question we might ask is whether the landowner's expectancy interest in the increased value of remainder property is entitled to the same protection under the just compensation clause as his or her more tangible property rights. The very exercise of the power of eminent domain in effect defeats a landowner's expectation of holding onto the condemned property and reaping any eventual enhancement in its value, since just compensation requires only that the owner be paid the fair market value of the property, measured on the date of valuation. (§ 1263.320, subd. (a).) In this regard, we note that if the government condemns an entire tract of land, the fair market value of the property in general does not include any increase in the value of the property that is attributable to the project for which the property is taken. (§ 1263.330; see *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478, 495 [93 Cal.Rptr. 833, 483 P.2d 1] [exception for "project enhanced value" of lands not originally expected to be within the scope of the project].)

A rule permitting offset of all reasonably certain, immediate and nonspeculative benefits has the virtue of treating benefits and severance damages evenhandedly. (Cf. §§ 1263.420, subd. (b), 1263.430 [parallel definitions of severance damage and benefit].) Continental was entitled to, and did, present evidence that the effects of the Green Line operation on perceptions of view, light and noise within its building would lower expected future rents. Contrary to a suggestion in Continental's brief, the increase in rental value that the MTA sought to prove appears to be no more speculative or uncertain, and no less immediate, than the decrease in rental value that Continental was permitted to prove. Continental insists the existing *Beveridge* rule does treat benefits and severance damages equally because "only damage that is special to the defendant's property is compensable." The contention is surely incorrect if the term "special" retains any connotation of singularity, uniqueness or peculiarity, inasmuch as the Green Line obviously will affect views, light and noise levels of other properties in the neighborhood of Continental's, property as to some of which no compensation will be paid. (Cf. *Bacich*, *supra*, 23 Cal.2d at p. 349.) If, on the other hand, "special" refers to any condition that affects the market value of the property and is not conjectural or speculative (*Ill. State Toll Hwy.* v. *Am. Nat. Bank* (1994) 162 Ill.2d 181 [205 Ill.Dec. 132, 642 N.E.2d 1249, 1255]; *Sanitary Dist. of Chicago* v. *Boening* (1915) 267 Ill. 118 [107 N.E. 810]), then Continental might press its claim for severance damages based on any decrease in the value of its property, but by the same token should be subject to setoff of any increase in value proven by competent evidence to result from proximity to the transit station. The severance damages Continental claimed for noise and loss of view thus are "special" to the same degree as the benefits the Green

Line allegedly will confer. Fairness requires parity of treatment. Such treatment, moreover, is faithful to the language of sections 1263.420 and 1263.430, neither of which, in considering damages and benefits to the remainder property, distinguishes between special and general.

On balance, and acknowledging that Continental's position is not without some force, we overrule *Beveridge, supra,* 137 Cal. 619, to the extent it holds that only "special" benefits may be offset against severance damages. We hold that in determining a landowner's entitlement to severance damages, the fact finder henceforth shall consider competent evidence relevant to any conditions caused by the project that affect the remainder property's fair market value, insofar as such evidence is neither conjectural nor speculative.[5]

We acknowledge that the rule we adopt today is not the majority view in the United States. (See 3 Nichols on Eminent Domain (rev. 3d ed. 1992) § 8A.03, pp. 8A-26 to 8A-31 and cases cited therein.) In adopting this rule, however, we join a quite respectable minority. (*Ill. State Toll Hwy.* v. *Am. Nat. Bank, supra,* 642 N.E.2d at p. 1255; *Sanitary Dist. of Chicago* v. *Boening, supra,* 107 N.E. at p. 812 [although Illinois law allows setoff for "special" benefits only, the definition of special benefits includes what in California would be called general benefits]; *Brand* v. *State* (1964) 21 A.D.2d 727 [250 N.Y.S.2d 158]; *State* v. *Atchison, Topeka And Santa Fe Railway Co.* (1966) 76 N.M. 587 [417 P.2d 68, 70]; *Michigan State Highway Commission* v. *Frederick* (1971) 32 Mich.App. 236 [188 N.W.2d 193]; see also N.C. Gen. Stat. § 136-112 [when North Carolina State Board of Transportation exercises power of eminent domain to condemn private property for public use, both general and special benefits may be deducted from owner's condemnation award]; *Strouds Creek & M. R. Co.* v. *Herold* (1947)

---

[5]In urging that, under our holding, it will not be "easier to calculate general and special benefits together than it is to calculate special benefits alone" because general benefits often are "less capable of quantification in a definite amount" (conc. & dis. opn. of Kennard, J., *post,* at pp. 733-734), the concurring and dissenting opinion does not acknowledge that the jury shall be permitted to consider only competent evidence that is neither speculative nor conjectural.

We note that the trial of condemnation actions shall continue to comply with the Eminent Domain Law, title 7 of part 3 of the Code of Civil Procedure, in particular section 1260.230 thereof, which provides: "As far as practicable, the trier of fact shall assess separately each of the following: [¶] (a) Compensation for the property taken . . . . [¶] (b) Where the property acquired is part of a larger parcel: [¶] (1) The amount of damage, if any, to the remainder . . . . [¶] (2) The amount of benefit, if any, to the remainder . . . . [¶] (c) Compensation for loss of goodwill, if any . . . ."

131 W.Va. 45 [45 S.E.2d 513, 519-522].) Like our sister minority jurisdictions, we are persuaded the rule we announce today is ultimately the most workable and the most fair to all parties concerned.[6]

*Costs*

■ For guidance on retrial, we next address the MTA's argument the Court of Appeal erred in reversing the trial court's denial of Continental's posttrial motion for litigation expenses.

Awards of litigation expenses in eminent domain actions are governed by section 1250.410, which provides, in pertinent part, as follows: "(a) At least 30 days prior to the date of the trial on issues relating to compensation, the plaintiff shall file with the court and serve on the defendant its final offer of compensation in the proceeding and the defendant shall file and serve on the plaintiff its final demand for compensation in the proceeding. Such offers and demands shall be the only offers and demands considered by the court in determining the entitlement, if any, to litigation expenses. . . . [¶] (b) If the court, on motion of the defendant made within 30 days after entry of judgment, finds that the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding, the costs allowed pursuant to Section 1268.710 shall include the defendant's litigation expenses. [¶] . . . [¶] (c) If timely made, the offers and demands as provided in subdivision (a) shall be considered by the court on the issue of determining an entitlement to litigation expenses."

In *Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790 [214 Cal.Rptr. 904, 700 P.2d 794] (*Gilmore*), we discussed the standard a trial court must apply in ruling on a motion for an award of litigation expenses pursuant to section 1250.410. We noted that prior law (former section 1249.3) had required the trial court, in ruling on such a motion, to determine whether the condemner's offer was unreasonable and the condemnee's demand was reasonable " 'all viewed in the light of the determination as to the value of the subject property.' " (*Gilmore, supra,* 38 Cal.3d at p. 808, italics omitted.)

---

[6]Amicus curiae Building Owners and Managers Association of Greater Los Angeles asserts that the mere existence of the governmental power to specially assess (see Pub. Util. Code, § 33000) should be sufficient to bar any offset of special benefits whenever the affected property is close enough to a transit station to justify its inclusion in an assessment district. This question was not raised below, and we need not decide it. Suffice it to say that, as the MTA points out, the record contains no evidence there ever have been or will be any proceedings to form a special assessment district for the transit project at issue in this case, and nothing we say here in any way affects the rule in *Oro Loma Sanitary Dist.* v. *Valley* (1948) 86 Cal.App.2d 875 [195 P.2d 913], that when an assessment *has been* imposed, there may be no offset of benefits.

In contrast, section 1250.410, we observed, requires the trial court to make its determination " 'in the light of the evidence admitted and the compensation awarded in the proceeding.' " (38 Cal.3d at p. 808, italics omitted.) We rejected the landowners' contention the trial court erred in denying their motion for litigation expenses because the award in that case was significantly higher than the highest offer made by the Burbank Redevelopment Agency, reasoning "the mathematical relation between the plaintiff's highest offer and the award is but one factor to be considered by the trial court under the new statute. Section 1250.410 requires the court to evaluate the reasonableness of the plaintiff's offer in light of the award and the evidence adduced at trial." (*Gilmore, supra*, 38 Cal.3d at p. 808.)

■ Several factors have emerged as general guidelines for determining the reasonableness or unreasonableness of offers. They are " '(1) the amount of the difference between the offer and the compensation awarded, (2) the percentage of the difference between the offer and award . . . and (3) the good faith, care and accuracy in how the amount of offer and the amount of demand, respectively, were determined.' " (*State of California* ex rel. *State Pub. Works Bd.* v. *Turner* (1979) 90 Cal.App.3d 33, 37 [153 Cal.Rptr. 156].) Thus, the mathematical relation between the condemner's highest offer and the award is only one factor that should enter into the trial court's determination. (*Gilmore, supra*, 38 Cal.3d at p. 808; *Community Redevelopment Agency* v. *Krause* (1984) 162 Cal.App.3d 860, 866 [209 Cal.Rptr. 1].)

Some Court of Appeal decisions have strayed from the principle that the mathematical disparity between the offer and the award is but one factor for the trial court to consider. For example, in *San Diego Gas & Electric Co.* v. *Daley, supra*, 205 Cal.App.3d at page 1352 (*Daley*), the court held unreasonable "as a matter of law" an offer that turned out to be 29.4 percent of the ultimate award. In support of that conclusion, the court cited *City of Gardena* v. *Camp* (1977) 70 Cal.App.3d 252 [138 Cal.Rptr. 656], which, however, was decided under former section 1249.3 and therefore is not precisely apposite in a case arising under the different language of section 1250.410. The *Daley* court also relied on *Redevelopment Agency* v. *First Christian Church* (1983) 140 Cal.App.3d 690, 706 [189 Cal.Rptr. 749], decided under the current statute, but in doing so misstated the holding of that case, which was to *reject* a condemner's argument that its offer was reasonable as a matter of law. We need say little more about this issue other than to note our disapproval of any pronouncement purporting to find unreasonableness as a matter of law based purely on mathematical disparity, and to commend the lower courts in every case to consider not only the numerical figures, but also " ' "the good faith, care and accuracy in how the amount of the offer and

the amount of the demand, respectively, were determined." [Citations.]'"
(*County of San Diego* v. *Woodward* (1986) 186 Cal.App.3d 82, 89 [230 Cal.Rptr. 406].)

In the present case, the MTA's final offer was $200,000 and Continental's final demand was $500,000. The trial court denied Continental's motion for litigation expenses, reasoning as follows: "Plaintiff's expert determined that just compensation totaled $76,500 and found no severance damages. Plaintiff's offer of $200,000 clearly did not ignore defendant's expert's opinion in its entirety. [¶] Two compensation issues separated the parties: loss due to noise and visual impact. Defendant's final demand apparently gave no weight to its *own* experts' opinion regarding loss due to visual impact. This conclusion follows from the fact that defendant's demand of $500,000 could not have included any amount for visual impact since, according to defendant's expert, the taking of the fee interest, the easements and the noise damage together exceeded $500,000. Since defendants gave no credence to its own expert's opinion regarding visual impact, it would be unfair to hold that plaintiff's failure to give any weight to that opinion was unreasonable. [¶] Continental also asserts that, in light of the evidence presented at trial, plaintiff's offer was unreasonable. Continental points out that plaintiff conceded severance damages of $25,000 for new architectural drawings and $85,000 for special window glazing to mitigate noise. Under cross examination, plaintiff's expert also admitted that he incorrectly discounted sums in his valuation of the temporary easement by $23,000. Since these sums, when added to those for the fee and the permanent easement as calculated by the plaintiff total $209,500, defendant argues that plaintiff's offer of $200,000 on its face was unreasonable. The court finds this difference to be insufficient to base a finding of unreasonableness against the plaintiff. [¶] It is clear plaintiff's offer and defendant's demand were so far apart because of the different manner in which their respective experts valued the noise and visual impact issues. As to the noise experts, each made highly technical presentations which the court found equally plausible in so far as it was able to understand the opinions. The court believes it would be unfair to determine that plaintiff acted unreasonably by relying on its own noise expert in light of the exceedingly technical nature of the evidence presented. [¶] With respect to the visual impact issue, the court observes that, in ruling on the motion for new trial,[7] it had occasion to carefully review Mr. Hennessey's testimony. Although the court found

---

[7]The MTA's motion for new trial urged that the jury's severance damage award was not supported by the evidence and that the trial court had erred in refusing to permit the MTA to cross-examine Hennessey, Continental's valuation expert, on the issue of enhancement of the value of the property due to proximity to a transit station and in excluding evidence of such enhancement.

Hennessey's testimony sufficient to defeat the motion, the court would be less than candid if it did not indicate that such testimony was not particularly impressive. Moreover, Hennessey refused to consider data from other markets, although he admitted this evidence might be relevant. Plaintiff's appraisers, who made in-depth studies of other markets, concluded that the overwhelming evidence showed that there were no severance damages. Under these circumstances, the court is unable to conclude that the plaintiff acted unreasonably."

In concluding the trial court abused its discretion in denying Continental's motion, the Court of Appeal relied primarily on the fact the MTA's offer ($200,000) was less than 18 percent of the severance damages awarded by the jury, and on the absolute disparity between the offer and the award. The Court of Appeal also took into account its view of the evidence bearing on the MTA's good faith, care and accuracy in determining the amount of the offer, concluding the MTA acted unreasonably in adhering to the view that proximity to the Douglas Street station was a special benefit that would enhance the value of Continental's property, despite the trial court's ruling excluding the MTA's proffered evidence to that effect. Of course, since we have concluded all reasonably certain, nonspeculative benefits resulting from the project may be offset against severance damages, it can hardly be said, in retrospect, that the MTA acted unreasonably. In any event, given that Hennessey's testimony, according to the trial court, was "less than impressive," and that Continental itself apparently did not give much weight to that testimony in formulating its offer, the MTA cannot be said to have made its offer unreasonably or in bad faith. On this record, the trial court did not "exceed[] the bounds of reason" in denying Continental's motion. (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 [153 Cal.Rptr. 423, 591 P.2d 911].) It follows the Court of Appeal erred in finding the trial court's ruling was an abuse of discretion.

### DISPOSITION

The judgment of the Court of Appeal is reversed and the cause remanded for further proceedings consistent with this opinion.

George, C. J., Mosk, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—Without any good reason for doing so, the majority abandons California's adherence to a long-established rule of American law followed by most other states. The rule in question operates in the field of just compensation for property taken for use by the government, specifically in cases where the government appropriates only a

portion of a landowner's parcel of real property. In such cases, the landowner receives, in addition to compensation for the portion taken, compensation for damages to the remainder not taken. (Code Civ. Proc., §§ 1263.310, 1263.410.) The Legislature has provided by statute that damages to the remainder are to be offset by the amount of any "benefit to the remainder." (*Id.*, § 1263.410, subd. (b).) The rule at issue here, which California courts have followed since 1902, provides that special benefits to the remainder, but not general benefits, are deducted from the damages to the remainder that are otherwise compensable. (*Beveridge* v. *Lewis* (1902) 137 Cal. 619 [70 P. 1083].) General benefits are those shared by all properties in the locale of the government project for which the property was taken. Special benefits, on the other hand, are not shared by all properties in the locality, but have some degree of uniqueness to the landowner's parcel.

The majority rejects the special benefit rule and holds that the landowner's recovery for damage to the remainder should be reduced by the amount of all benefits, whether special or general, to the remainder. Because the existing rule limiting the reduction of a landowner's damages to only the amount of special benefits is fairer than the majority's holding and because it is a workable rule that has withstood the test of time, I dissent.

I

Defendant Continental Development Corporation (Continental) owned a triangular-shaped parcel of property, approximately 4.43 acres in area. Plaintiff Los Angeles Metropolitan Transportation Authority (MTA), in connection with the construction of its Green Line rail transit project, desired to run its elevated rail guideway along the northeast side of Continental's parcel. That side of Continental's property was 785 feet long and bordered an existing railroad right-of-way. The MTA filed an action to take an air rights easement approximately 5 feet wide running the entire length of the northeast side of Continental's parcel, 375 square feet of land in fee located within the easement, and a temporary construction easement.

When the MTA filed the condemnation action, Continental already had plans to construct an office building, but had not yet commenced construction. Because the taking necessitated setting back the building from the elevated rail guideway to provide a fire line, Continental revised its plans, relocating the building about 30 feet from the Green Line. By the time of trial, it had constructed a four-story office building on the lot. Continental also incurred expenses for laminating the building's windows on the side facing the Green Line in order to reduce noise.

Continental claimed damages to the remainder of its severed parcel as follows: (1) the cost of revising its building plans ($23,123); (2) the cost of laminating the windows on the side of the building facing the Green Line and additional future costs to design, manufacture, and install double-paned windows to further reduce noise levels ($416,604); and (3) the capitalized reduction in rental value due to view and light impairment of offices located on the Green Line side of the building (over $1 million).

One of the Green Line stations, the Douglas Street Station, is located approximately 1,613 feet from Continental's parcel. At a pretrial hearing, the MTA claimed that the proximity of Continental's parcel to the Douglas Street Station was a special benefit worth millions of dollars which should be offset against Continental's claimed severance damages. The trial court ruled that the proximity of the Douglas Street Station to the remainder of Continental's parcel was not a special benefit.

The jury awarded Continental $1,122,149 in damages, including: (1) the value of the land taken in fee ($11,936); (2) the value of the air easement and temporary construction easement ($94,420); and (3) damages to the remainder ($1,015,793).

Continental moved for litigation expenses under Code of Civil Procedure section 1250.410,[1] which allows a court to award litigation expenses upon finding that the condemner's offer was unreasonable and the condemnee's demand was reasonable "viewed in the light of the evidence admitted and the compensation awarded in the proceeding." The trial court denied Continental's motion for expenses.

On appeal, the Court of Appeal affirmed the trial court's determination that proximity to the Douglas Street Station was a general benefit, and therefore the MTA was not entitled to offset that benefit against the damages to the remainder. The Court of Appeal reversed the trial court's denial of Continental's litigation expenses.

## II

I begin with a description of the constitutional and statutory provisions for just compensation that are relevant to the question of what benefits should be offset against the damages to the remainder when a partial taking occurs. Our state Constitution requires the government to pay "just compensation" for property "taken or damaged." (Cal. Const., art. I, § 19.) To fulfill this

---

[1]All further statutory citations are to the Code of Civil Procedure.

constitutional obligation, the Legislature has created a detailed statutory scheme for providing just compensation. This statutory scheme specifically addresses the determination of just compensation in partial takings cases.

The Legislature has recognized that when the government takes only a portion of a parcel of land, the landowner's losses are not necessarily limited to the value of the portion actually taken. In order to account for both the value of the portion taken and the landowner's other losses, it has provided the following.

First, the landowner receives the fair market value of the portion of the parcel that is actually taken. (§ 1263.310.) This amount is separately computed independent of any other losses. (§ 1260.230, subd. (a).) The portion taken is valued by itself, without regard to the fact that it was part of a larger parcel. (§ 1263.320.) Also disregarded is any increase or decrease in value attributable to the project itself. (§ 1263.330.) Compensation for the portion taken is never reduced by any benefit the project provides to the remainder. (§ 1263.410.) Thus, compensation for the portion taken is limited to its fair market value as an independent unit of property, without regard to the taken portion's existence as a part of a larger parcel, the effect of the project on the portion taken, or the effect of the project on the remainder of the parcel.

Next, the damage caused to the remainder by the severance of the portion taken from the remainder is computed. (§§ 1260.230, subd. (b)(1), 1263.420, subd. (a).) Conceptually, this amount can be conceived of as the difference between the fair market value (absent the project) of the parcel as a whole and the sum of the fair market values (computed separately and without regard to any benefits or depreciation caused by the project) of the property taken and of the remainder.

In providing that the landowner may recover for the damage caused by the severance of the portion taken from the remainder, the Legislature has implicitly recognized that the value of a whole parcel of land is often greater than the sum of its parts. A larger parcel presents more opportunities for use and development than do a number of isolated smaller parcels of similar condition with the same total area. A tall building feasible technically and economically on a large parcel may be more than twice as large as the buildings that may be feasibly built on two separate parcels each half the area of the large parcel; a large parcel that can be economically farmed as a unit may be uneconomic for that use when it is divided by a limited-access freeway that requires farm machinery to be transported long distances between the two portions of the remainder.

Returning to the statutory method of calculating damages for a partial taking, the next step is as follows: Any damage to the remainder caused by the effects of the project's construction and use is calculated, and is then added to the previously calculated damage resulting from severance of the portion taken from the remainder. (§ 1263.420, subd. (b).)

Finally, this sum of damages to the remainder is reduced by "the amount of the benefit to the remainder" (§ 1263.410, subd. (b).) The "[b]enefit to the remainder is the benefit, if any, caused by the construction and use of the project for which the property is taken." (§ 1263.430.)

Although the statutes in question that use the term "benefit," sections 1263.410 and 1263.430, do not define it, their legislative history reveals that the Legislature intended to continue existing law with its distinction between special and general benefits, while permitting that body of law to continue to evolve judicially. These statutes were enacted in 1975 as part of a comprehensive revision of the statutes governing eminent domain law proposed by the California Law Revision Commission and adopted by the Legislature. (Stats. 1975, ch. 1275, § 2, p. 3452.) In its commentary to section 1263.430, the Law Revision Commission stated: "Section 1263.430 codifies prior law by defining the benefit to the remainder that may be offset against damage to the remainder in an eminent domain proceeding. . . . Section 1263.430 does not abrogate any court-developed rules relating to the offset of benefits nor does it impair the ability of the courts to continue to develop the law in this area. See Beveridge v. Lewis, 137 Cal. 619, 70 P. 1083 (1902) (only 'special' benefits may be offset)." (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1263.430, p. 82.)

As the Law Revision Commission's commentary notes, this court in 1902 first adopted the distinction between general and special benefits in *Beveridge* v. *Lewis, supra,* 137 Cal. 619. General benefits are those enjoyed by the entire locality affected by a project. (See *id.* at pp. 623-624 ["General benefits consist in an increase in the value of land common to the community generally, from advantages which will accrue to the community from the improvement."], 625; *United States* v. *River Rouge Co.* (1926) 269 U.S. 411, 415-416 [46 S.Ct. 144, 146, 70 L.Ed. 339] ["a benefit common to all the lands in the vicinity"]; BAJI No. 11.95 (8th ed. 1994); 3 Nichols on Eminent Domain (rev. 3d ed. 1992) § 8A.04[2], p. 8A-38 ["General benefits have been described as those benefits which result from the fulfillment of the public project which necessitated the taking and are common to all lands in the vicinity of the condemnee's property."]; Randolph, The Law of Eminent Domain in the United States (1894) § 269, p. 250 ["A general benefit is an

advantage not peculiar to the remainder of a tract part of which is taken, but conferred by the public work upon all property within range of its utility."].) The increase in traffic generated by a new surface road leading to an existing commercial district would usually be a general benefit to all the property within the area served by the road. (See *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 295-296 [74 Cal.Rptr. 521, 449 P.2d 737].)

Special benefits, by contrast, have some direct and peculiar relationship to the remainder, often arising from the contiguity of the remainder and the project. (*Beveridge* v. *Lewis, supra,* 137 Cal. 619, 624, 626; BAJI No. 11.95 (8th ed. 1994); 3 Nichols on Eminent Domain, *supra,* § 8A.04[2], p. 8A-39 ["Special benefits are those which arise from the peculiar relation of the land in question to the public improvement."]; Annot., Eminent Domain: Deduction of Benefits in Determining Compensation or Damages in Proceedings Involving Opening, Widening, or Otherwise Altering Highway (1967) 13 A.L.R.3d 1149, 1168 ["Special benefits have been defined in a number of instances as those which inure directly and peculiarly to the property in question, and not to all neighboring and similarly situated property in general."].) In *Beveridge,* our court described special benefits as those which "result from the mere construction of the improvement, and are peculiar to the land in question." (*Beveridge* v. *Lewis, supra,* 137 Cal. at p. 624.) To continue with the example of a new road discussed above, if the new road bisects an existing parcel, the new frontage it creates for the two remainders of the parcel would usually be a special benefit to those remainders. (*Los Angeles* v. *Marblehead Land Co.* (1928) 95 Cal.App. 602, 614-615 [273 P. 131] [new highway frontage created in remainder was a special benefit]; 3 Nichols on Eminent Domain, *supra,* § 8A.04[2][b], p. 8A-51.) As courts and commentators have recognized and as the majority acknowledges, special benefits need not be absolutely unique to the remainder (maj. opn., *ante,* at p. 708). (*People* ex rel. *Dept. Pub. Wks.* v. *Giumarra Farms, Inc.* (1971) 22 Cal.App.3d 98, 104 [99 Cal.Rptr. 272]; BAJI No. 11.95 (8th ed. 1994); see also *United States* v. *River Rouge Co., supra,* 269 U.S. 411, 415-416 [46 S.Ct. 144, 145-146]; 3 Nichols on Eminent Domain, *supra,* § 8A.04[2], pp. 8A-39 to 8A-44 [collecting cases].) In *River Rouge Co.,* for example, the government took portions of a number of riparian parcels for the purpose of dredging and widening a channel to make the river navigable to large ships. The riparian landowners all shared a special benefit of direct access to a newly navigable river, a benefit that was not shared by other non-waterfront properties in the vicinity. (*United States* v. *River Rouge Co., supra,* 269 U.S. 411, 415-416 [46 S.Ct. 144, 145-146].)

## III

With this statutory framework in mind, I now turn to the question in this case: In offsetting the landowner's damages by the "amount of the benefit to the remainder" pursuant to section 1263.410, should the term "benefit" continue to be limited to only special benefits? The majority answers "no" to this question of statutory interpretation, asserting that the distinction between special and general benefits is impossible of consistent application and results in unfair overcompensation to landowners, and should be overruled. I disagree.

I see no need to upset this long-settled rule of California law. This court adopted the distinction between special and general benefits in 1902 in *Beveridge* v. *Lewis, supra,* 137 Cal. 619, and since then California courts have consistently adhered to it. (See, e.g., *Pierpont Inn, Inc.* v. *State of California, supra,* 70 Cal.2d 282, 296; *People* v. *Thompson* (1954) 43 Cal.2d 13, 28-29 [271 P.2d 507]; *People* ex rel. *Dept. Pub. Wks.* v. *Simon Newman Co.* (1974) 37 Cal.App.3d 398, 409 [112 Cal.Rptr. 298].)

Considerations of stare decisis require that this court not overrule its past precedent without substantial justification. "[I]t is not enough that a different rule might seem preferable to us now . . . . ' "It is, of course, a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices." ' " (*People* v. *Cuevas* (1995) 12 Cal.4th 252, 269 [48 Cal.Rptr.2d 135, 906 P.2d 1290].)

Moreover, we should be particularly hesitant to abandon the rule that only special benefits may be offset given the Legislature's approval of this rule when it revised the eminent domain laws in 1975. As set forth above, the legislative history of section 1263.430 states that the section "codifies prior law." Although the Legislature may not have prohibited the result the majority reaches today, given the statement in the legislative history that "[s]ection 1263.430 does not . . . impair the ability of the courts to continue to develop the law in this area" (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc., *supra,* foll. § 1263.430, p. 82), it seems likely the Legislature presumed that the development of this area of the law would continue within a framework that preserved the distinction between special and general benefits, not that that framework would be abandoned.

There is no substantial justification for abandoning the distinction between special and general benefits. In resolving the statutory question of how broadly to interpret the term "benefit to the remainder" (§§ 1263.410,

subd. (b), 1263.430), one should keep in mind that it implements the just compensation provision of the California Constitution. The goal of that constitutional provision is to ensure that the landowner is compensated for the value of what has been taken or damaged by the government and does not "contribute more than his proper share to the public undertaking." (*Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 642 [220 P.2d 897].)

This purpose is furthered by deducting only special and not general benefits from the damages to the remainder, for that rule produces a fairer determination of just compensation in the circumstances of a partial taking. As our statutory scheme recognizes, when a portion of a larger parcel is taken, the landowner's loss is not limited to the value of that portion. The landowner loses the synergistic value of the parcel—the extent to which its value as a whole exceeds the separate values of the portion taken and the remainder (because, as noted, a larger parcel offers more opportunities for development and use). The general benefits to the remainder, however, would have been the landowner's even in the absence of any taking. It is unfair to the landowner who has suffered a severance of his or her property to reduce his or her compensation by offsetting general benefits to the remainder against the severance and other damages to the remainder. All properties in the locality of the project receive those general benefits, yet only the landowner whose property has been in part physically taken is made, by forgoing compensation for his or her other losses, to pay for those general benefits.

As we stated almost a century ago in *Beveridge* v. *Lewis, supra,* 137 Cal. at page 625: "The chance that land will increase in value as population increases and new facilities for transportation and new markets are created is an element of value quite generally taken into consideration in the purchase of land in estimating its present market value. This chance for gain is the property of the land-owner. If a part of his property is taken for the construction of the [project], he stands in reference to the other property not taken like similar property-owners in the neighborhood. His neighbors are not required to surrender this prospective enhancement of value in order to secure the increased facilities which the [project] will afford."

The preeminent commentary on eminent domain law puts it similarly: "General benefits may not be used to offset damages because the owner whose land is taken would be placed in a worse position than his neighbor whose estate lies outside the path of the improvement and who shares in the increased value without any pecuniary loss. . . . The condemnee pays in

taxation for his share of general benefits, just as other members of the public, and therefore, is entitled to receive his fair portion of the general advantages brought about by a public improvement." (3 Nichols on Eminent Domain, *supra*, § 8A.05, pp. 8A-57 to 8A-58.)

Nor is this a novel insight. A leading treatise on eminent domain law relied on by this court in *Beveridge* v. *Lewis*, *supra*, 137 Cal. 619, 624, reached a similar conclusion: "The distinction between general and special benefits seems to be well taken. General benefits consist of an increase in the value of land common to the community generally, arising from the supposed advantages which will accrue to the community by reason of the work or improvement in question. These advantages may never be realized, and if they are it is unjust that one person should be obliged to pay for them by a contribution of property while his neighbor whose property is not taken enjoys the same advantages without price. . . . [T]he community and each individual of the community is entitled to enjoy these advantages without otherwise paying for them." (2 Lewis, Eminent Domain (2d ed. 1900) § 471, pp. 1021-1022, fn. omitted.) Another prominent treatise relied on by the *Beveridge* court expressed the same view: "But, in estimating either the injuries or the benefits, those which the owner sustains or receives in common with the community generally, and which are not peculiar to him and connected with his ownership, use, and enjoyment of the particular parcel of land, should be altogether excluded, as it would be unjust to compensate him for the one, or to charge him with the other, when no account is taken of such incidental benefits and injuries with other citizens who receive or feel them equally with himself, but whose lands do not chance to be taken." (Cooley, Constitutional Limitations (2d ed. 1871) p. 566.) The logic of this argument and the fairness provided by the special benefit rule have not diminished over the past century.

This rule is the majority rule among the jurisdictions in the United States: "[I]t has been almost universally accepted that only special benefits may be deducted from damages to the remainder." (3 Nichols on Eminent Domain, *supra*, § 8A.05, p. 8A-61; accord, Annot., Eminent Domain: Deduction of Benefits in Determining Compensation or Damages in Proceedings Involving Opening, Widening, or Otherwise Altering Highway, *supra*, 13 A.L.R.3d 1149, 1154.) The overwhelming acceptance of this rule over a long period of time is further evidence that it yields the fairest practical measure of compensation to a landowner in the case of a partial taking, and I would retain it as the rule for California.

IV

The majority takes the position, however, that the distinction between special and general benefits is uncertain and thus cannot be consistently

applied. In considering this assertion, it is important to recognize that calculating the amount of just compensation due when the government takes property is not an exact science. Determining fair market value, the lodestar for compensation calculations, is an exercise in hypothesis, not the discovery of a fact of nature. "[E]ven in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety." (*United States* v. *Miller* (1943) 317 U.S. 369, 374 [63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55].) The appraisal of fair market value often is, "at best, a guess by informed persons." (*Id.* at p. 375 [63 S.Ct. at p. 280]; see also Shampton, *Statistical Evidence of Real Estate Valuation: Establishing Value Without Appraisers* (1996) 21 S. Ill. U. L.J. 113, 114 ["[I]t is unfortunately the case that no one knows the true market value of a parcel of real estate until it actually sells. . . . [¶] . . . [¶] Appraisals are ultimately products of opinion rather than pure calculation."].) Each parcel of land is unique, and land values fluctuate constantly. In the case of a partial taking, the fact that the property taken is part of a larger parcel only further complicates the task of estimating changes in value to both the portion taken and the remainder.

In such circumstances, the role of the courts is not to search for a deceptive precision by abstracting the definition of "benefit" to the point where it becomes unnecessary to distinguish between special and general benefits. To do so would sacrifice the additional measure of fairness provided by the special benefit rule's more individualized determination of the injury inflicted by a taking. It is both futile and misleading to attempt "to reduce the concept of 'just compensation' to a formula." (*United States* v. *Cors* (1949) 337 U.S. 325, 332 [69 S.Ct. 1086, 1090, 93 L.Ed. 1392].) Instead, courts must engage in a search for "practical standards" and "endeavor to find working rules that will do substantial justice." (*Ibid.*) However fact-bound and imprecise these rules may seem, their legitimacy should turn on their effectiveness in practice, not on their theoretical elegance. Of necessity, given the inherent uniqueness of every parcel of land and the individuality of its relationship to any particular project, the determination of what constitutes a special benefit will be a fact-intensive inquiry in which generalizations will be of only limited utility. The special benefit rule, while it does not turn every determination of whether a particular type of benefit counts as an offset into a rule of law that does not vary with the surrounding circumstances, has proven itself a workable rule that produces substantial justice.

In this sense, the special benefit rule is akin to the reasonable person standard of negligence liability. That standard, which asks whether the

defendant used the amount of care that a reasonable person would, given all of the circumstances, similarly yields conclusions that are "inherently situational" and that cannot be generalized into fixed rules of conduct that do not vary with the surrounding circumstances, for "the amount of care deemed reasonable in any particular case will vary." (*Flowers* v. *Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 997 [35 Cal.Rptr.2d 685, 884 P.2d 142].) In that context, as here, the fairest rule is one that requires a sensitive, case-by-case inquiry that takes into account all of the surrounding circumstances.

Nor is the majority correct that the special benefit rule is too uncertain and inconsistent to guide adjudication. The rule's long history belies that assertion. Courts both in California and elsewhere have been able to coherently apply the distinction between special and general benefits. (See, e.g., *United States* v. *River Rouge Co., supra*, 269 U.S. 411, 415-416 [46 S.Ct. 144, 145-146]; *People* ex rel. *Dept. Pub. Wks.* v. *Simon Newman Co., supra*, 37 Cal.App.3d 398, 409; *People* ex rel. *Dept. Pub. Wks.* v. *Home Trust Investment Co.* (1970) 8 Cal.App.3d 1022, 1028-1029 [87 Cal.Rptr. 722]; *Sacramento etc. Drainage Dist.* v. *W. P. Roduner Cattle etc. Co.* (1968) 268 Cal.App.2d 199, 204-207 [73 Cal.Rptr. 733]; *People* ex rel. *Dept. Pub. Wks.* v. *Edgar* (1963) 219 Cal.App.2d 381, 384-385 [32 Cal.Rptr. 892]; *City of Hayward* v. *Unger* (1961) 194 Cal.App.2d 516, 518-519 [15 Cal.Rptr. 301]; *United States* v. *2,477.79 Acres of Land, etc.* (5th Cir. 1958) 259 F.2d 23, 28-29; *Taub* v. *City of Deer Park* (Tex. 1994) 882 S.W.2d 824, 827-828; *State of La., Dept. of Highways* v. *Modica* (La.Ct.App. 1987) 514 So.2d 22, 24; *Caponi* v. *Carlson* (Minn.Ct.App. 1986) 392 N.W.2d 591, 596; *State Dept. of Trans.* v. *Montgomery Ward Dev.* (1986) 79 Or.App. 457, 464-466 [719 P.2d 507]; *State* ex rel. *State Hwy. Com'n, etc.* v. *Tate* (Mo. 1980) 592 S.W.2d 777, 778-780; *Gradison* v. *State* (1973) 260 Ind. 688, 695-696 [300 N.E.2d 67]; *New Jersey Turnpike Auth.* v. *Herrontown Woods* (1976) 145 N.J.Super. 279, 285-286 [367 A.2d 893]; *State* v. *Botluck* (1964) 57 Del. 362, 371 [200 A.2d 424, 428].)

In an attempt to demonstrate that the special benefit rule breeds inconsistency, the majority asserts that the rule's application in *Pierpont Inn, Inc.* v. *State of California, supra*, 70 Cal.2d 282, conflicts with its application in *City of Hayward* v. *Unger, supra*, 194 Cal.App.2d 516, and *Los Angeles* v. *Marblehead Land Co., supra*, 95 Cal.App. 602. These cases, however, present no inconsistency.

In *City of Hayward* v. *Unger, supra*, 194 Cal.App.2d 516, the condemnee's store was on land abutting a street that was being widened; the trial court

found that the store's exposure to an increased flow of traffic on the street in front of it was a special benefit not shared in general with all properties in the general vicinity. (*City of Hayward* v. *Unger, supra,* 194 Cal.App.2d 516, 518.) In *Los Angeles* v. *Marblehead Land Co., supra,* 95 Cal.App. 602, a new road was put through the condemnee's parcel, creating two remainders which each fronted on the new road. The trial court held that the new frontage and access provided by the road were special benefits to the two remainders. (*Id.* at pp. 614-615.)

In *Pierpont Inn, Inc.* v. *State of California, supra,* 70 Cal.2d 282, the claimed special benefit was a new freeway interchange. The condemner's expert in *Pierpont Inn,* however, admitted that the benefit of the interchange to the condemnee's property was no different and no greater than the benefit received by " '*all* the properties in the vicinity,' " an admission that the benefit was general, not special. (*Id.* at pp. 295-296, italics added.) In light of that admission, there was no evidence of any special benefit, and for that reason it would have been impossible for a court to find that there was a special benefit. Thus, there is no actual inconsistency between the cases.

Moreover, the results in these three cases are consistent as well with the theory of special and general benefits. In most cases, merely being in the general vicinity of a freeway interchange, as in *Pierpont Inn, Inc.* v. *State of California, supra,* 70 Cal.2d 282, will not be a special benefit. The special benefits provided by a freeway interchange are usually extremely localized; often gas stations, fast-food restaurants, and other roadside service businesses cluster at the ramps leading on and off the freeway, but are absent only a few blocks further from the freeway. (See *People* ex rel. *Dept. Pub. Wks.* v. *Giumarra Farms, Inc., supra,* 22 Cal.App.3d 98, 106 [where remainder surrounded interchange of new freeway, limited portion of remainder adjacent to interchange received special benefit because of its commercial potential for roadside businesses].) By contrast, when a surface street project creates new or improved frontage or access for a directly abutting remainder, as occurred in *City of Hayward* v. *Unger, supra,* 194 Cal.App.2d 516, and *Los Angeles* v. *Marblehead Land Co., supra,* 95 Cal.App. 602, that frontage or access frequently will be a special benefit not shared by other properties in the vicinity whose frontage and access are unaffected by the project.

Thus, the majority has failed to demonstrate any instance in our case law in which the special benefit rule has led to inconsistent results.

Nor will it necessarily be easier to calculate general and special benefits together than it is to calculate special benefits alone. General benefits, being

more diffuse geographically, also often may be less capable of quantification in a definite amount. It is one thing to say that a freeway interchange may bring some general benefit to all the properties in the large area served by the surface streets connecting with the interchange; it is quite another thing to attempt to quantify that benefit. Because special benefits are more specific to one or a limited number of properties and usually arise from a more direct relationship between the property benefited and the project, they are in general more easily quantifiable. Additionally, as this court observed in *Beveridge* v. *Lewis, supra,* 137 Cal. 619, 624, general benefits may not immediately accrue, further increasing the difficulty of quantifying them. And if the majority is correct that the geographic scope of general benefits is completely arbitrary and indeterminate (maj. opn., *ante,* at p. 708), abandoning the distinction between special and general benefits will do nothing to solve the problem of determining the scope of the general benefits to be offset against the damages to the remainder. Thus, the simplification promised by the majority's new rule is illusory.

Finally, the majority takes the position that it is fairer to deduct general benefits as well as special benefits. The majority asserts that the landowner may obtain compensation for damages from the project that are generally shared throughout the locality as well as special damages peculiar to the property severed, and therefore offsetting only special benefits results in an unfair overcompensation to landowners. The premise of the majority's argument is erroneous, for the damages that a landowner may recover are more limited than the majority acknowledges. A landowner may not recover for damages to the remainder that are "general to all property owners in the neighborhood, and not special to [the landowner]." (*City of Berkeley* v. *Von Adelung* (1963) 214 Cal.App.2d 791, 793 [29 Cal.Rptr. 802]; accord, *People* v. *Gianni* (1933) 130 Cal.App. 584, 588-589 [20 P.2d 87].) The examples of compensable damages listed by this court in *Pierpont Inn, Inc.* v. *State of California, supra,* 70 Cal.2d 282, 295, and repeated by the majority are ones that typically will arise out of some direct and unique relationship (often the relationship of contiguity) between the remainder of the severed property and the project and will not be shared generally by all properties in the vicinity served by the project: deprivation of access, impairment of light and air, impairment of view, invasion of privacy. Because only special and not general damages are compensable, only special and not general benefits should be deductible.[2]

---

[2]*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343 [144 P.2d 818], relied on by the majority, does not establish a contrary rule that landowners may recover for general damages to the remainder. At issue in *Bacich* was the question of compensation for damage to a property

## V

I now turn to the application of the special benefit rule in this case. The trial court applied the special benefit rule and concluded that any benefit to the remainder arising from its proximity to the Douglas Street Station, almost one-third of a mile distant, was not a special benefit but a general benefit shared by all properties in the vicinity of the station. Accordingly, it offset no benefits against the damages to Continental's remainder. The Court of Appeal upheld this determination. There is substantial evidence to support the trial court's conclusion that the benefit of proximity to the station was general and not special. There are 565 other properties as close or closer to the Douglas Street Station as Continental's remainder, and no evidence that the benefit of proximity to the remainder was in any way distinguishable from the same benefit shared by all properties within the vicinity of the station. Accordingly, I would affirm the judgment of the Court of Appeal to the extent that it affirms the trial court's determination that the proximity of Continental's remainder to the Douglas Street Station was not a special benefit to be offset against the damage to the remainder.

Finally, I concur in that portion of the majority opinion which concludes, contrary to the Court of Appeal, that the trial court did not abuse its discretion in denying Continental its litigation costs.

### CONCLUSION

When a parcel of property is severed by a government taking, any damages to the remainder are part of the injury the landowner suffers. To

right; at issue here is compensation for damages to a remainder that do not rise to the level of damage to a property right. In *Bacich*, the landowner's property right to access over the abutting street was impaired, and this court held that he was entitled to compensation for the impairment of that property right. (*Id.* at pp. 345-346, 349-353.) There was no severance in that case, and no question, as here, of what damages to a remainder are compensable when no property right in the remainder has been taken or damaged.

Moreover, as the *Bacich* court made clear in a passage quoted by the majority, the damaging of a property right is necessarily a special damage peculiar to the owner of the right in question and not shared by the public in general: "If he has a property right and it has been impaired, the damage is necessarily peculiar to himself and is different in kind from that suffered by him as a member of the public or by the public generally, for his particular property right as a property owner and not as a member of the public has been damaged." (*Bacich* v. *Board of Control, supra,* 23 Cal.2d 343, 349.) Finally, the *Bacich* court *denied* the landowner recovery for general damages the project caused that did not impair any property right (discontinuance of a street railway that formerly ran in front of his property, destruction of all other residences in the area). (*Id.* at pp. 355-356; see also *Reardon* v. *San Francisco* (1885) 66 Cal. 492, 506 [6 P. 317] ["damage" compensable under the California Constitution does not include "such damage as the owner of the property injured sustains in common with other abutters on the street or the general public, but only to that special injury which he receives over and above such common injury"].)

refuse to compensate the landowner for those damages by offsetting against them the general benefits that all in the vicinity of the project receive unfairly forces the landowner to pay for benefits that others receive for free. Limiting offsets only to special benefits more equitably distributes among the entire community the benefits and burdens of the project: The landowner is not forced to pay for the general benefits that others receive without charge, the community pays for the damage that the project causes to the remainder, yet the landowner is denied the windfall of receiving both the special benefits to the remainder and the full value of the damages to the remainder.

For the reasons discussed above, the long-standing special benefit rule has proven itself practical and workable, as well as fair, and I would retain it. Accordingly, I would affirm that portion of the judgment of the Court of Appeal affirming the trial court's decision that there were no benefits to offset the damages due Continental, and reverse that portion of the Court of Appeals' judgment reversing the trial court's order denying Continental its litigation costs.

Baxter, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—In great part, I agree with Justice Kennard's thoughtful criticism of the majority's new "setoff" rule for partial-takings cases. For the first time in modern California history, a public agency that condemns part of a larger parcel may reduce its monetary liability for severance damages by "setting off" benefits to the remainder which are widely shared by condemned and uncondemned parcels alike. There has been no change in the well-established laws governing eminent domain valuation that would compel this radical alteration, and, as Justice Kennard indicates, the majority provide no other persuasive justification for decreeing it.

Even more troubling, as Justice Kennard points out, is that the majority expressly overrule a principle of fundamental fairness long followed in this state and elsewhere as a matter of constitutional doctrine. It has been widely understood that the owner of a parcel taken in part is denied "just" compensation for "damage[]" to the remainder (Cal. Const., art. I, § 19; see also Code Civ. Proc., §§ 1263.230, subd. (b), 1263.420) if required to forfeit, as a setoff against such compensation, benefits to the remainder which are shared in common with untouched parcels, and which the latter are allowed to retain. (*Beveridge* v. *Lewis* (1902) 137 Cal. 619, 625 [70 P. 1083] (*Beveridge*); see generally, e.g., 3 Nichols, Eminent Domain (rev. 3d ed.

1992) § 8A.05, pp. 8A-57 to 8A-58; 1 Lewis, Eminent Domain (3d ed. 1909) § 693, p. 1198; Cooley, Constitutional Limitations (2d ed. 1871) p. 565; but see, e.g., *McCoy* v. *Union Elevated R. R. Co.* (1918) 247 U.S. 354, 365-366 [38 S.Ct. 504, 507-508, 62 L.Ed. 1156].)

For this very reason, I would go further than Justice Kennard's dissent explicitly goes. Even if prior cases have not stated the rule in precisely this way, I would make clear that when part of a larger parcel is taken for a public project, the value of any benefit conferred by the project upon the remainder may be deemed "special," and may thus be set off against otherwise cognizable severance damages to the remainder, *only* when the benefit is "reasonably certain and nonspeculative" (maj. opn., *ante*, at p. 716) *and* is shared, if at all, *only* by *other parcels similarly subjected to a partial taking.* In other words, any benefit conferred by the project upon condemned and uncondemned parcels alike must be considered "general," and not subject to offset, even if the benefit is clear and present, and its diffusion throughout the community is not particularly broad.

The following example will illustrate the rule I believe to be correct: A new rail transit line will travel, for its entire distance, along the boundary between parcels A and B, two large plots of developed commercial land in separate ownership. A station will be constructed midway along the line to allow passengers to embark and disembark in either direction. By fortuity, both the right-of-way and the land needed for the station will be taken only from parcel A, leaving parcel B untouched, but the station itself will serve both parcels as its primary function, and both will have equal access to it. Parcels A and B will thus enjoy similar immediate and concrete benefits from the line, of a kind and degree not shared by the community in general. Nonetheless, I submit that for purposes of eminent domain law, it is a "general" benefit which may not be offset against severance damages to the untaken portion of parcel A.

If the rule is otherwise, parcel A not only suffers an involuntary severance not imposed upon parcel B, but is required to forfeit, by means of an offset, the monetary value of related benefits that its otherwise identically situated neighbor, parcel B, may retain without cost. Such a formula denies the "just" compensation our state's Constitution requires insofar as it forces the owner of condemned property, in particular, to " ' "contribute more than his proper share to the public undertaking." ' " (*Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327, 365 [27 Cal.Rptr.2d 613, 867 P.2d 724].)

By distinguishing special from general benefits in the just and simple fashion I have suggested, we also do much to solve the problems of clarity

and definition that have prompted the majority, unwisely, to abandon the distinction altogether. The majority complain that the *Beveridge* court "distinguished general and special benefits along two distinct dimensions: generality versus peculiarity and conjecture versus certainty," but did not explain what result was appropriate when a benefit was peculiar but conjectural, or certain but widespread. (Maj. opn., *ante*, at p. 707.) We may end any confusion on the point by saying that a special benefit subject to offset is one *both* reasonably certain and immediate *and* unique to parcels which have been subjected to a partial physical taking. Under this definition, all other benefits become general and immune from offset.

As all recognize, no amount of legal refinement can solve every difficulty in applying the special/general benefits rule to individual cases. In practice, real estate appraisal is an art, not a science. Legitimate disputes may always be expected to arise about the value of a particular alleged benefit, as well its certainty and peculiarity. The answer, however, is not to abandon a doctrine which, for nearly a century, has justly protected the rights of California property owners against abuse of the awesome sovereign power of eminent domain. On the contrary, the rule should be clarified and strengthened to permit full realization of the sound constitutional policy this court recognized in *Beveridge*. The solution I propose serves that purpose.

Under that standard, the trial court and the Court of Appeal were obviously correct in concluding that defendant Continental Development Corporation (Continental) gleaned only a general benefit from the proximity of its remainder parcel to the Douglas Street Green Line station. Numerous uncondemned parcels enjoyed an equal or greater proximity to the station. I would therefore affirm the judgment of the Court of Appeal to that extent. Like Justice Kennard, I concur in that portion of the majority judgment which concludes, contrary to the Court of Appeal, that the trial court did not abuse its discretion in denying Continental its litigation costs.

The petition of appellant Continental Development Corporation for a rehearing was denied November 12, 1997. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.